**Shelly PERRY, et al., Plaintiffs,**

v.

**HOUSEHOLD RETAIL SERVICES, INC., et al., Defendants.**

**Civ.A. No. 95–D–45–N.**

United States District Court, M.D. Alabama, Northern Division.

March 29, 1998.

426

C. Knox McLaney, III, Angela L. Kimbrough, McLaney & Associates, Montgomery, AL, James O. Latturner, Edelman & Combs, Chicago, IL, Lynn W. Jinks, III, Jinks, Smithart, Jackson & Daniel, L.L.C., Union Springs, AL, Cathleen M. Combs, Daniel A. Edelman, Charles E. Petit, Edelman & Combs, Chicago, IL, for plaintiffs.

John E. Goodman, Norman Jetmundsen, Jr., Michael D. McKibben, Charles Keith Hamilton, Julie Scharfenberg Elmer, Andrew J. Noble, III, Bradley, Arant, Rose & White, Birmingham, AL, Edward P. Turner, Jr., Halron W. Turner, Turner, Onderdonk, Kimbrough & Howell, P.A., Chatom, AL, for defendants.

## ORDER

DE MENT, District Judge.

This cause is now presented to the court on the Recommendation of the Magistrate Judge, filed April 1, 1997, Defendants' objections thereto, filed April 14, 1997, Plaintiffs' objections thereto, filed April 14, 1997, Plaintiffs' renewed objection thereto, filed January 9, 1998, and the various supplemental submissions of authority filed by the Parties.

The court has carefully read the Magistrate's Recommendation and considered the objections of counsel, and is of the opinion that said Recommendation is well taken and is due to be adopted, approved, and affirmed. It is, therefore, CONSIDERED and ORDERED that:

1. Plaintiffs' objections be, and the same are hereby, OVERRULED;

2. Defendants' objections be, and the same are hereby, OVERRULED;

3. The Recommendation of the Magistrate Judge in this cause be, and the same is hereby, ADOPTED, APPROVED, and AFFIRMED;

4. The Motion for Class Certification, filed by the Plaintiffs on November 27, 1995, be and the same is hereby GRANTED in part and DENIED in part, as further described above.

## RECOMMENDATION OF THE MAGISTRATE JUDGE

### I. INTRODUCTION AND PROCEDURAL HISTORY

The plaintiff, Shelly Perry, filed this action against a series of defendants alleging that the actions of the defendants with regard to the sale and financing of a satellite dish violated various state and federal laws.

On November 27, 1995, Perry, through counsel, filed a motion for class certification seeking certification of a class of all persons, located anywhere within the United States, who satisfy the following criteria:

(A) They entered into a consumer credit transaction with a merchant whose business was the selling of satellite dishes which was financed by Household Retail Services, Inc. of Household Bank (Illinois) N.A.; and

(B) The transaction(s) occurred within (i) one year prior to the filing of the original complaint for purposes of the Truth in Lending Act ("TILA") claim, (ii) four years for the purposes of the RICO claim, and (iii) three years for the purposes of the Illinois Consumer Fraud Act.

Perry also sought certification of a subclass of all persons who satisfy the following criteria:

(A) They entered into a consumer credit transaction with a merchant whose business was the selling of satellite dishes which was financed by Household Retail Services, Inc. or Household Bank (Illinois), N.A.;

(B) The transactions occurred within two years prior to the filing of the original complaint for purposes of the fraud by suppression; and

(C) The contract was signed within the period beginning December 28, 1990.

The initial hearing on the motion for class certification was held on January 7, 1997. By the time of the class certification hearing, Shelly Perry had died. His daughter, as administratrix of his estate, has been substituted as the plaintiff. The court conducted an additional hearing by conference call on February 24, 1997. The parties have also provided the court with extensive evidentiary submissions and briefs.

### II. FACTS

At some time in the past, Household Retail Services, Inc. (HRSI) and Household Bank (Illinois) N.A. (HBI) embarked upon a joint venture to provide consumer financing for satellite dish purchases. That joint venture revolved around the use of private label credit cards developed for distribution by satellite dish wholesalers. The private label credit card at issue in this case is the "Powerline Card" developed by HRSI for Best Reception Systems. Best is a wholesale distributor of satellite dishes and related equipment. Best allows its dealers to use the Powerline Card program to obtain financing for persons who seek to purchase satellite dishes. Gus Zacharias, Best's Director of Consumer Fi-

nancing, described the process during his deposition as follows:

Q. (Counsel) Let's go through this whole transaction.

A. (Mr. Zacharias) Uh-huh.

Q. From beginning to end now. You've got a dealer signed up contractually to make sales, and he goes out and sells someone a satellite dish, and I assume at what point he would take a credit application; is that correct?

A. Actually the salesman of the dealer would, yes.

Q. The salesman of the dealer. He takes a credit application. Take me through the whole process from that point on the financing?

A. Okay. The salesman would get a credit application from the customer. The credit application would be sent back to the dealer. The dealer would then send that credit application to us, Best Reception. We would send that information to Household Retail Services. They would render a decision on the credit worthiness of the customer, whether they're approved, whether they're declined, and how much their credit limit would be. Household Retail Services would communicate back to Best Reception. Best Reception would communicate that back to the dealer, and the dealer would then know if the customer had sufficient credit to consummate the transaction.

The evidence before the court shows that the private label credit card business generated millions of dollars for HRSI.

The process which led to the financing and purchase of the satellite dish at issue in this case began sometime in the summer of 1994 when Jerome Knowles, a salesman for Alabama DBS Programming, Inc., knocked on the door of the trailer where Shirley Canady and her father, Shelly Perry, were living. Mr. Perry was seriously ill and confined to a wheelchair. His sole source of income was a monthly Social Security check. Knowles explained that he was taking credit applications for satellite dish purchases and that the payments would be $58.00 per month. He told Ms. Canady and Mr. Perry that they would get approximately 100 channels on the dish and a year's subscription to Orbit Magazine. Mr. Perry said that he would think about it and Knowles said he would come back. Knowles did, in fact, come back to the trailer. He told Canady and Perry that the dish system would cost approximately $4000.00 and again said that the monthly payments would be $58.00. Mr. Perry, on the second visit, agreed to purchase the system. Knowles filled out an order form which showed the cost of the system, an extended warranty, and an Orbit magazine subscription to be $4046.00. According to the order form, the monthly payments were to be $68.78. Canady saw this order form and the proposed monthly payment when Knowles visited the trailer the second time to close the deal. According to Canady, Knowles told them that they would be receiving a credit card in the mail. Knowles also said that the card could be used toward the purchasing of the satellite dish and to activate additional channels.

The order form was eventually given to Tom Tanneyhill, the owner of Alabama DBS Cable Programming, Inc. Tanneyhill then contacted Wayne Fields, the president of Home Video in Douglasville, Georgia. Tanneyhill told Fields that he had sold a satellite dish system but that he had not been approved as a dealer for Best Reception Systems and, thus, needed assistance finding a financing source. He asked Fields to help obtain financing for Mr. Perry's purchase. Fields had done some satellite dish installation and servicing for Tanneyhill previously. In the course of getting Fields to help with the financing, Tanneyhill sent Fields the order form which Knowles wrote up for Mr. Perry's satellite dish system purchase.

Fields eventually went to the Perry trailer to install the dish. As part of the process, he had Ms. Canady sign a series of documents on Mr. Perry's behalf.[1] The first document which Fields had Ms. Canady sign was the Retail Installment Credit Agreement which is a brochure that contains both the credit

---

1. Mr. Perry had a physical infirmity which made writing difficult.

application and an explanation of the financing arrangement.

According to Fields, Ms. Canady signed the credit application on August 24, 1994. Fields then separated the credit application from the Retail Installment Credit Agreement and gave the disclosure portion to Ms. Canady. Ms. Canady does not recall signing the credit application and denies ever seeing or reading the Retail Installment Credit Agreement. The following exchange occurred during her deposition:

Q. (Counsel for HRSI) Let me show you what I've marked as Exhibit 6 (the Powerline brochure) and ask you if you've ever seen a brochure like that before?

A. (Ms. Canady) No, sir. I have not.

Q. You've never seen that before today?

A. No, sir.

Q. Inside Exhibit 6 there's something called a Retail Installment Credit Agreement. Do you see that?

A. Yes, sir.

Q. Have you seen that before today?

A. No, sir, I have not.

Q. Have you ever read a document like that before today?

A. No sir.

Q. Did Mr. Knowles ever give you a document like this?

A. No, sir.

Q. Did Mr.—did either of the two installers give you a document like this?

A. No, sir.[2]

At some time on the 24th of August, Best Reception informed Home Video by FAX that Mr. Perry had been approved for a credit line of $3750.00.[3]

Fields also indicated in his deposition that he gave Mr. Perry and Ms. Canady a sales receipt for the credit card showing that the amount financed was $4046.00,[4] a document indicating that they had purchased an extended warranty,[5] and a completion certificate.[6] These documents bear Ms. Canady's signature but she has no recollection of seeing any of the documents other than the extended warranty agreement. Mr. Perry died without having his deposition taken so there is nothing to indicate whether or not he saw the documents. Fields also testified, in his deposition, that he explained all of the paperwork to Ms. Canady and Mr. Perry and that they appeared to understand it. He specifically recalls telling them that they would receive a credit card in the mail. A few days after installation, Ms. Canady and Mr. Perry experienced a problem with the dish. Mr. Fields went to the trailer on August 29, 1994 and repaired it.

In early September, Ms. Canady received a statement from HRSI indicating that the balance on the account was $4046.00 and that the monthly payments were $77.00. At some point in time, she also received a Powerline Card in her father's name. No payments on the account were ever made. HRSI then initiated efforts to collect the monies owed them. The collection efforts, which included repeated phone calls, led Ms. Canady to seek the assistance of counsel to obtain relief from the debt. That effort at debt relief generated this lawsuit which seeks certification of a nationwide class action.

## III. DISCUSSION

■ Rule 23(a) of the Federal Rules of Civil Procedure specifies the four prerequisites to maintaining a suit as a class action:

One or more members of a class may sue or be sued as representative parties on behalf of a class only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of

---

**2.** Canady deposition at pp. 77–78. Canady's deposition was not taken until December 1995. There is no discussion of her deposition in the summary judgment opinions.

**3.** Fields testified in his deposition that HRSI had approved Perry for credit before he went to the house to install the satellite dish. The paper trail does support that testimony.

**4.** The receipt is Exhibit 4 to Fields' deposition and Exhibit 3 to Canady's deposition.

**5.** The extended warranty agreement is Exhibit 5 to Fields' deposition and Exhibit 4 to Canady's deposition.

**6.** The completion certificate is Exhibit 6 to Fields' deposition and Exhibit 5 to Canady's deposition.

law or fact common to the class, (3) the claims or defenses of the representative party are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately represent the burdens of the class.

The burden is on the party who seeks to certify a class to show that the prerequisites of Rule 23(a) are established. *Nelson v. United States Steel Corp.*, 709 F.2d 675, 679 (11th Cir.1983); *Earnest v. General Motors Corp.*, 923 F.Supp. 1469, 1473 (N.D.Ala.1996).

### A. NUMEROSITY—RULE 23(a)(1)

■ The nationwide class of persons who financed their satellite dish purchases with Best through HRSI consists of thousands of persons. Obviously, the numerosity requirement is satisfied.[7]

### B. COMMONALITY—RULE 23(a)(2)

■ Rule 23(a)(2) requires that there be questions of law or fact common to the members of the class. The threshold for commonality is not high. "Aimed in part at 'determining whether there is a need for combined treatment and a benefit to be derived therefrom, the rule requires only that resolution of the common questions affect all or a substantial number of the class members.'" *Jenkins v. Raymark Industries, Inc.*, 782 F.2d 468, 472 (5th Cir.1986) (citations omitted). As one court has expressed the requirements of commonality under the Rule:

> Rule 23(a)(2) requires that 'there are questions of law or fact common to the class.' Yet not every question of law or fact must be common to every member of the class. The requirement is met if the questions linking the class members are 'substantially related to the resolution of the litigation even though the individuals are not identically situated.' Identical questions are not necessary and factual discrepancies are not fatal to certification. Rule 23(a)(2) may be satisfied if common questions of liability

are present despite individual differences in damages:

> *In re Workers' Compensation*, 130 F.R.D. 99, 104 (D.Minn.1990) (citations omitted).

■ This case clearly presents a common issue, i.e. whether the defendants have violated state and federal law by providing open ended credit disclosures rather than closed ended credit disclosures. The actions of the defendants were uniform throughout the entire class and, in fact, the disclosures were made in written documents. The requirement of commonality is easily satisfied in this case.

### C. TYPICALITY AND ADEQUACY OF REPRESENTATION— RULE 23(a)(3) & (4)[8]

■ The typicality and adequacy of representation requirements serve the important interests of protecting the legal rights of class members. *General Tel. Co. of Southwest v. Falcon*, 457 U.S. 147, 157 n. 13, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982). The typicality requirement focuses on the interest of the class representative. As the United States Supreme Court noted in *General Tel. Co. of Northwest, Inc. v. E.E.O.C.*, 446 U.S. 318, 330, 100 S.Ct. 1698, 64 L.Ed.2d 319 (1980), "the typicality requirement is said to limit the class claims to those fairly encompassed by the named plaintiff's claims." Stated another way, typicality exists when a plaintiff's injury arises from or is directly related to a wrong to a class and that wrong includes the wrong to the plaintiff. *See In re American Medical Systems, Inc.*, 75 F.3d 1069, 1082 (6th Cir.1996); *see also Cox v. American Cast Iron Pipe*, 784 F.2d 1546, 1557 (11th Cir.), *cert. denied*, 479 U.S. 883, 107 S.Ct. 274, 93 L.Ed.2d 250 (1986) (the claims actually litigated in the suit must simply be those fairly represented by the named plaintiffs).

■ The adequacy of representation requirement focuses on the ability of the class representative to assert and defend the

---

**7.** The defendants argue that only persons who purchased satellites through Home Video may be class members. For reasons discussed *infra* Part "D", the court disagrees.

**8.** The inquiries of these requirements are essentially the same. *Coleman v. Cannon Oil*, 141 F.R.D. 516, 522 (M.D.Ala.1992).

class with forthrightness and vigor. *Kirkpatrick v. J.C. Bradford & Co.*, 827 F.2d 718, 726 (11th Cir.1987), *cert. denied*, 485 U.S. 959, 108 S.Ct. 1220, 99 L.Ed.2d 421 (1988); *see also American Medical Systems*, 75 F.3d at 1083 (adequacy of representation means the class representative has common interest with the class and will vigorously prosecute the interest of the class through qualified counsel). The inquiry · whether the named plaintiff will represent the class with sufficient forthrightness and vigor invokes questions about the financial status of the plaintiff, *see Schatzman v. Talley*, 91 F.R.D. 270, 273 (N.D.Ga.1981), and the competence of class counsel; *Griffin v. Carlin*, 755 F.2d 1516, 1532 (11th Cir.1985). The class representative's personal finances, however, are not especially important. A plaintiff of limited financial means can still be a class representative in a major class actions because counsel have a greater financial interest in obtaining successful resolution of a class suit than do the individual members. *See Deposit Guaranty Nat'l Bank v. Roper*, 445 U.S. 326, 100 S.Ct. 1166, 63 L.Ed.2d 427 (1980). Thus, the subjective desire to vigorously prosecute the case is supplied by counsel. *Kirkpatrick*, 827 F.2d at 727. There is no question in the court's mind about the skill of plaintiff's counsel and their interest in the case. They have vigorously and competently represented the plaintiff and the putative class.

The court has significant concerns, however, about the typicality of the plaintiff's claims and her adequacy as a class representative. The present class representative, Shirley Canady, is the administratrix of the estate of the original plaintiff, Shelly Perry. Mr. Perry died before a deposition could be taken and consequently there is no testimony from him. There is, however, testimony from Ms. Canady, about the facts concerning the transaction at issue in this case. Her testimony seriously undercuts her capacity to serve as class representative for all of the claims except for the TILA claim. Of particular concern is the fact that Ms. Canady testified that she does not recall reading any of the documents which she now claims are misleading and fraudulent. More important,

she denies receiving or reading the disclosure statement.

As noted above, Ms. Canady testified in a deposition taken in December 1995 that she has no independent recollection of any of the documents which she signed except for the extended warranty agreement. In addition, she categorically denies reading or receiving the Retail Installment Credit Agreement which is at the heart of this case. She also testified that she had conversations with the satellite dish salesman about the fact that the Powerline Card was, indeed, a credit card that could be utilized for other purchases.

Q Did Mr. Knowles [the satellite salesman] on either occasion, say anything about credit applications or credit cards or anything like that?

A (Ms. Canady) Yes, he said it would be a credit card sent in the mail.

Q A credit card sent in the mail?

A Yes.

. . . .

Q Did he say anything else about the credit card or what you could do with it?

A He said it would be used toward purchasing the satellite.

Q Did he say whether the card could be used to purchase the Orbit magazine subscription?

A He said I could get other channels turned on with it that I wanted to get turned on.

Q With the credit card?

A Yes.

Q And you could pay for those with the credit card?

A. Yes.

Ms. Canady also testified that her father understood this as well.

Q At the time of the purchase of the system, was it your understanding that you could—that you would be issued or your father would be issued a credit card?

A Yes.

Q Okay. And was that your father's understanding as well?

A Yes.

Q And was it your understanding when your father received the credit card that he would be able to use it to purchase other items associated with the satellite system?

A Yes.

Q Was that your father's understanding?

A Yes.

Thus, according to Ms. Canady's deposition, both she and her deceased father knew they were getting a credit card and that the credit card account could be used for repeated transactions.

Also, Ms. Canady testified that the salesman made oral representations to her about the monthly payments. It is clear that she and her father relied on those oral representations in deciding whether or not to purchase the satellite dish.[9]

The court will now examine the typicality and adequacy of representation issue as it relates to each of the claims for which the Ms. Canady seeks class certification.

### 1. THE TILA CLAIM

#### (a) Liability

Ms. Canady alleges that HRSI made open-end credit disclosures to her father about the financing of his satellite dish system rather than closed-end disclosures, and thus, violated the Truth in Lending Act. As the court noted in its order denying summary judgment, the claim is that "by employing open end credit disclosures with respect to transactions not legitimately classifiable as open end, the defendants violated TILA § 128, 15 U.S.C. § 1638 and the implementing regulations, 12 C.F.R. § 226.17–18." Order dated August 5, 1996. Ms. Canady contends that her father should have been provided with the following material items of information which are required to be disclosed in closed-end credit transactions: (1) the number of payments; (2) the amount of each monthly payment; (3) the amount financed; (4) the total finance charge; (5) the total of payments; and (6) the total sales price.

It is undisputed that the defendants did not make all of the disclosures which would have been required if the transaction is considered to be a close-end transaction.

■ Closed-end credit is defined as any consumer credit which is other than open-end credit. 12 C.F.R. § 226.2(a)(10). Open-end credit is defined as consumer credit extended by a creditor under a plan which (1) the creditor reasonably contemplates repeated transactions; (2) the creditor may impose a finance charge from time to time on an outstanding unpaid balance; and (3) the amount of credit that may be extended to the consumer during the term of the plan (up to any limit set by the creditor) is generally made available to the extent that any outstanding balance is repaid. 12 C.F.R. § 226.2(a)(20). In this case, the jury must determine whether the credit extended to Mr. Perry under the Powerline Card program was open-end credit or close-end credit. If the jury determines the credit was close-end credit, there is a TILA violation and Mr. Perry's estate would be entitled to claim actual damages, 15 U.S.C. § 1640(a)(1), and statutory damages, 15 U.S.C. § 1640(a)(2)(A) & (B). Statutory damages are recoverable without either proof or recovery of actual damages. *See Gambardella v. G. Fox & Co.*, 716 F.2d 104 (2d Cir.1983).

■ Ms. Canady could still represent a TILA liability class even though there can be no showing that her father relied on the allegedly inaccurate disclosure. The knowledge of the wronged consumer has nothing to do with the alleged TILA violation. Rather, it is the state of mind of the creditor that is the focus of a court in determining whether a plan is improperly characterized as open ended. "The criteria regarding repeated transaction is a question of fact to be decided in the context of the creditor's type of business and the creditor's relationship with the consumer." *Benion v. Bank One, Dayton, N.A.*, 1996 WL 242994 *4 (N.D.Il.1996). Thus, the defendants would be liable under TILA if they failed to make the appropriate disclosures even if the plaintiff never read the provided disclosures. Ms. Canady would

---

9. The plaintiff does not seek relief for those rep- resentations.

not have to show that her father relied on the allegedly inadequate disclosure. Mere participation in the financing scheme is sufficient. Therefore, Ms. Canady's father's claim is typical for purposes of determining TILA liability and she is an adequate representative of a TILA liability class.

### (b) Statutory Damages

■■■ A defendant who violates § 128 of the Truth in Lending Act is liable for actual damages and statutory damages. Ms. Canady, as the representative of her father's estate, is an adequate class representative for a TILA statutory damages class. She was a participant in the financing scheme which she contends violates the statute. In her role as class representative, she can present the TILA claim to a jury for a determination of whether the Powerline Card Program is open-end or close-end credit. If the jury determines that TILA was violated, there will be an assessment of statutory damages. As previously noted, the focus of the TILA claim and the statutory damages inquiry will be the defendants' practices and not the conduct or state of mind of Mr. Perry or Ms. Canady, or any other class member.

### (c) Actual Damages

■■■ As a class representative for the TILA statutory damages class, Ms. Canady is simply the conduit which allows a jury to determine whether the defendants' practices violated TILA. To recover actual damages, however, the state of mind of the consumer plaintiff is relevant. Under the applicable law,

> A plaintiff claiming actual damages must establish a causal connection between the inaccurate disclosure and his injury by demonstrating that he relied on the inaccurate disclosure and thereby was effectively prevented from obtaining better credit terms elsewhere.

*Adiel v. Chase Federal Savings & Loan Ass'n.,* 630 F.Supp. 131, 133 (S.D.Fla.1986), *aff'd,* 810 F.2d 1051 (11th Cir.1987). In this case, there is no proof that Mr. Perry relied on the allegedly inaccurate disclosures. He is dead. His deposition was never taken and there is no evidence about his state of mind

in the record. His daughter, Ms. Canady, signed his name to all of the relevant documents. However, she testified in deposition that she did not remember the contents of any of the documents except for the extended warranty document. More important, she testified that she had never received nor read the Retail Installment Credit Agreement which is the critical document in the case. Consequently, she cannot show that these documents influenced her father's decision in any way. Ms. Canady simply cannot make a claim on behalf of her father's estate for actual damages in this case. She would thus be inadequate to represent a class of persons with actual damages.

### 2. THE ILLINOIS CONSUMER FRAUD ACT (ICFA) CLAIM

The Illinois Consumer Fraud Act provides:

> Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, or the use or employment of any practice described in Section 2 of the "Uniform Deceptive Trade Practices Act" ... in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby.

Section 815 ILCS 505/2.

■■■ Similar to liability under Section 128 of TILA, the ICFA imposes liability on a defendant for engaging in unfair or deceptive practices, even absent evidence of injury or loss to a consumer, or evidence that the consumer was in fact misled or deceived. Accordingly, liability does not require proof of reliance by the consumer. *See Martin v. Heinold Commodities, Inc.,* 163 Ill.2d 33, 205 Ill.Dec. 443, 643 N.E.2d 734, 746 (1994). Proof of reliance, which is intertwined with demonstrating that the alleged fraud proximately caused plaintiff's injury, becomes relevant to establish actual damages. *See Stehl v. Brown's Sporting Goods, Inc.,* 236 Ill. App.3d 976, 177 Ill.Dec. 267, 603 N.E.2d 48 (1992). *See also Zekman v. Direct American Marketers, Inc.,* 286 Ill.App.3d 462, 221 Ill.

Dec. 570, 675 N.E.2d 994 (1997) ("In reality, however, the theory of reliance is ambiguously present within the parameters of the concept of proximate cause, so that to maintain a private action under the Act, a party must have relied on the wrong to some extent in order to establish proximate cause.")

 In this case, it is clear that Ms. Canady cannot make the necessary showing of proximate cause to recover actual damages under the ICFA and, therefore, cannot maintain a private action under the ICFA. As pointed out previously, she does not remember any of the documents relating to the transaction in this case except for the extended warranty agreement; she specifically denies having ever received or read the Retail Installment Credit Agreement which discussed the disclosures about which she now complains; and she cannot show that the disclosures influenced her father in any way. Each of these factors is relevant to support a claim for actual damages under the ICFA Since Ms. Canady and her father's injuries may not have arisen from the same wrong that affected other class members, Ms. Canady is not a proper class representative for a private actual damages claim under the ICFA.

### 3. THE RICO CLAIM

 The complaint also includes a RICO claim against HRSI and HBI based on the use of mail and wire fraud. The elements of mail and wire fraud are identical. *Carpenter v. United States*, 484 U.S. 19, 25 n. 6, 108 S.Ct. 316, 98 L.Ed.2d 275 (1987). Mail or wire fraud exists when a person (1) intentionally participates in a scheme to defraud another of money or property, and (2) uses the mails or wires in furtherance of that scheme. *United States v. Downs*, 870 F.2d 613, 615 (11th Cir.1989). Additionally, in the RICO context, "... when the alleged predicate act is mail or wire fraud, the plaintiff must have been the target of the scheme to defraud and must have relied to his detriment on the misrepresentations made in furtherance of that scheme." *Pelletier v. Zweifel*, 921 F.2d 1465, 1499–1500 (11th Cir.), *cert. denied*, 502 U.S. 855, 112 S.Ct. 167, 116 L.Ed.2d 131 (1991). Citing *Pine Ridge Re-*

*cycling, Inc. v. Butts County of Georgia*, 855 F.Supp. 1264 (M.D.Ga.1994), counsel for the plaintiff suggest that reliance is not an element of a mail fraud. *Pine Ridge* does not help the plaintiff. *Pine Ridge* presents unusual factual circumstances where the allegation was that mail fraud was directed at a third party rather than the plaintiff. As the court noted, "in a case where mail fraud is directed at a third party, reliance by that third party can cause injury to the plaintiff. A plaintiff need only show that the third party relied and that this reliance proximately caused plaintiff's injury." *Id.* at 1274. There is no allegation of third party reliance in this case, and even under *Pine Ridge*, reliance is still an important element of a RICO claim. It also is an important element that cannot be proven in this case. According to the undisputed facts before the court, Ms. Canady cannot prove that her father relied on the documents related to the transaction. More important, she denies ever receiving or reading the Retail Installment Credit Agreement. Since she was the guiding hand in the transaction, if she did not see or receive the agreement, her father also did not see or receive the agreement. It is, therefore, impossible, as a matter of law, for Mr. Perry to have relied on an omission or misrepresentation from those documents to his detriment. Also, there is evidence that Mr. Perry relied on representations of the satellite dish salesman rather than the documents. Based on the foregoing, Mr. Perry's circumstance is not typical of the members of the class. Therefore, Ms. Canady would not be a proper class representative for the RICO claim.

### 4. THE FRAUD CLAIM

 Ms. Canady, on behalf of her father's estate, also seeks certification of a subclass of Alabama residents for a claim under Alabama fraud law. The complaint alleges that "defendants, through their agents, concealed and fraudulently failed to disclose to Plaintiff and the class, the nature of the credit he was applying for, the cost of the credit and other information required by TILA for closed ended transactions." Amended Complaint filed August 8, 1995.

The essential elements of a fraudulent suppression claim under Alabama law are (1) a duty on the part of the defendant to disclose, (2) the defendant's suppression of material facts, (3) the defendant's knowledge of the facts and their materiality, (4) action by the plaintiff in reliance on the suppression and (5) damages resulting from the reliance action. *Wolff v. Allstate Life Ins. Co.*, 985 F.2d 1524 (11th Cir.1993) (citing *Hardy v. Blue Cross & Blue Shield of Alabama*, 585 So.2d 29, 32 (Ala.1991)). Plaintiff's counsel argues that reliance is not an element of a fraud by suppression under Alabama law. It is clear to the court, however, that reliance is indeed an element of a fraudulent suppression cause of action. Some of the opinions of the Alabama Supreme Court do not use the term "reliance." Instead, courts have defined the reliance element as a requirement that the plaintiff prove "that the defendant's concealment or failure to disclose the material fact induced the plaintiff to act or to refrain from acting." *Dodd v. Nelda Stephenson Chevrolet, Inc.*, 626 So.2d 1288, 1293 (Ala.1993). Whether the term is "reliance" or "inducement," Ms. Canady still must show that the suppression had some effect on her father's actions or inactions. In this case, she simply cannot make that showing. Ms. Canady, as previously noted, testified that she did not remember any of the documents except the extended warranty agreement and she specifically denied ever receiving or reading the retail installment credit agreement. It goes without saying that if Ms. Canady did not see the document, Mr. Perry did not. Further, there is evidence that representations from Mr. Knowles about the monthly payment may have induced Mr. Perry to act. Mr. Perry's claims are not typical of the class on the fraud claim since it is clear from the undisputed evidence before the court that the documents provided him by HRSI did not induce him to act because, according to his daughter's testimony, neither she nor her father ever saw the documents. It would be unconscionable to allow Ms. Canady to represent a class of persons who, indeed, might have relied on the representations in the retail installment credit agreement and been induced to act by the alleged non-disclosures.

■ In summary, the court finds that the requirements of Rule 23(a)(1) and 23(a)(2), numerosity and commonality, respectively, are satisfied. The court finds that the adequacy of representation requirement of Rule 23(a)(4) is satisfied as far as plaintiff's counsel is concerned. However, the court finds that the typicality requirement of Rule 23(a)(3) as intertwined with the adequacy of representation requirements of Rule 23(a)(4) is satisfied by the proposed class representative only as to the TILA claim for statutory damages. Ms. Canady is not a proper class representative for the TILA claim for actual damages, the ICFA claim for actual damages, the RICO claim, and Alabama state law fraud claim. Consequently, a class should not be certified for those claims. In reaching this conclusion, the court is aware of well-settled admonition that a court should not assess the plaintiff's likelihood of success on the merits in deciding whether a class should be certified. *See Kirkpatrick*, 827 F.2d at 722. However, the court would be remiss in its duty to potential class members who will be bound by the decision in this case if it overlooked obvious and undisputed facts concerning the inadequacy of the class representative.

## D. RULE 23(b)(3)

### 1. CLASS DEFINITION

The court has concluded that the plaintiff's claims are typical and she is an adequate class representative only for the TILA claim for liability and statutory damages.[10] The parties disagree over the definition of the class. The plaintiff seeks to maintain a class of all persons who entered into a consumer transaction with a merchant whose business was the selling of a satellite dish which was financed by Household Retail Services, Inc. or Household Bank (Illinois), N.A. The defendants seek to limit the class to customers of Home Video. The court believes that the appropriate class definition is somewhere in between.

■ The evidence before the court has focused on the Powerline Credit Card which

10. The plaintiff, of course, may go to trial in her individual capacity on the other claims.

was developed by HRSI for Best Reception Systems. There is no evidence concerning the operation of private label credit cards developed for other wholesalers. There is also no evidence that Household Bank had anything to do with the Powerline Credit Card. Absent that evidence, it simply would be inappropriate to assume that the operation of the Best Reception Systems' Powerline Credit Card is the same as the private label credit cards developed for other wholesalers. By the same token, it would be inappropriate to limit the class simply to persons who had purchased satellite dishes from the Home Video dealership. Because of the nature of the Powerline program, HRSI could be held liable as an assignee for all Powerline accounts because of the relationship between HRSI and Best, and Best and its dealers. *See* Memorandum Opinion and Order on Motion for Summary Judgment filed August 5, 1996. There is no suggestion in the record that the Powerline program varied in any way from dealer to dealer. Indeed, the Retail Installment Credit Agreement was the same for all Powerline customers. The evidence also makes clear that HRSI prescribed the credit practices and disclosures, and had complete control over those credit practices. The actions of HRSI, with regard to the disclosures, were the same across the spectrum of Powerline customers thereby making class treatment of the TILA claim appropriate. Accordingly, an appropriate class would be all persons throughout the United States who:

(A) purchased satellite television equipment for residential installation;

(B) financed the purchase through the Powerline Credit Card system developed by HRSI for Best Reception Systems and its dealers; and

(C) made the purchase within one year of the filing of the complaint in this case.

## 2. PREDOMINANCE AND SUPERIORITY

■ Before a class can be certified under the provisions of this class action rule, the court must find that "the questions of law or fact common to the members of the class predominate over questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed.R.Civ.P. 23(b)(3). In deciding whether the predominance and superiority requirements are met, the court may take into account problems of manageability. *See Andrews v. American Tel. & Tel. Co.,* 95 F.3d 1014, 1023 (11th Cir.1996).

■ The focus of the TILA liability and statutory damages claim is simply whether the disclosure which HRSI made in the Powerline Credit card program violates TILA and if it does, what statutory damages should be imposed. There is no dispute about the content of the disclosures and the disclosures were common to every class member. The questions of law and fact common to the class predominate over any individual questions. A jury can determine the liability of HRSI under TILA and if they find liability, assess statutory damages. The resolution of the issue of liability in a single proceeding is also a superior way to process these claims. The alternative is to have literally thousands of individual actions to decide liability. That procedure would be inefficient and would be a needless waste of judicial resources.

In addition, a TILA statutory damages class is clearly a superior method for adjudicating the question of whether the defendants have violated the law and what statutory damages should be awarded. As one court has noted, " ... efficiency and consistency concerns weigh strongly in favor of allowing all class members to challenge the legality of the defendants' practices, rather than forcing each class member to wage his or her own legal battle against the defendants." *Benion,* 1996 WL 242994 at *5. In this case, the issue of liability under TILA will be litigated on a class-wide basis and statutory damages determined in a single proceeding which will resolve the question of the defendants' liability once and for all. This practice of determining liability but not individual damages is appropriate because of the diverse proof required to establish actual damages. *See McCoy v. Salem Mortg. Co.,* 74 F.R.D. 8 (E.D.Mich.1976).

The defendants argue that the existence of potential counterclaims prohibits the certification of a class in this case. The defendants' argument overlooks binding circuit precedent. As the court noted in *Roper v. Consurve, Inc.,* 578 F.2d 1106, 1116 (5th Cir.1978), *aff'd,* 445 U.S. 326, 100 S.Ct. 1166, 63 L.Ed.2d 427 (1980) "[t]he potential assertion of counterclaims against these few members of the proposed class cannot be allowed to defeat an otherwise valid class action when to do so would effectively deprive thousands of class members of the relief to which they would be entitled." Therefore, the existence of potential counterclaims does not preclude certification of the proposed class.

## IV. CONCLUSION

For the foregoing reasons, it is the RECOMMENDATION of the Magistrate Judge that the motion for class certification filed on November 27, 1995 be GRANTED in part and DENIED in part as follows. The Magistrate Judge recommends that a TILA liability and statutory damages class be certified against HRSI under Rule 23(b)(3) of the Federal Rules of Civil Procedure consisting of all persons throughout the United States who:

1. Purchased satellite television equipment for residential installation;

2. Financed the purchase through the Powerline Credit Card system developed by HRSI for Best Reception Systems and its dealers; and

3. Made the purchase within one year of the filing of the complaint in this case.