Henry Lee "Leroy" PICKETT,
et al., Plaintiffs,

v.

IBP, INC., Defendant.

No. Civ.A. 96–A–1103–N.

United States District Court,
M.D. Alabama,
Northern Division.

Sept. 15, 1998.

648

Joe R. Whatley, Jr., Andrew Clay Allen, Cooper, Mitch, Crawford, Kuydendall & Whatley, Birmingham, AL, Ernest C. Hornsby, Jr., Larry Wade Morris, Morris, Haynes, Ingram & Hornsby, Alexander City, AL, Randy Beard, Beard & Beard, Guntersville, AL, Stephen K. Griffith, Knight & Griffith, Cullman, AL, for Plaintiffs.

William G. Schopf, Jr., Patrick J. Heneghan, Schopf & Weiss, Chicago, IL, Richard H. Gill, Lee H. Copeland, George W. Walker, III, Copeland, Franco, Screws & Gill, P.A., Montgomery, AL, for Iowa Beef Processors, defendant.

Gordon W. Schnell, Mackoff, Kellogg, Kirby & Kloster, PC, Dickinson, ND, for North Dakota Stockmen's Association (NDSA), amicus.

Lynn A. Hayes, Farmers' Legal Action Group, Inc., St. Paul, MN, for Western Organization of Resource Councils, amicus.

Steve Scanlin, Boise, ID, for Idaho Rural Council, amicus.

Scott Polikov, Austin, TX, for Wilson County Farm Bureau, amicus.

John E. Bloomquist, for Southeastern Montana Livestock Association, amicus.

Kenneth E. Vines, U.S. Attorney's Office, Montgomery, AL, for Secretary of Agriculture of the United States of America, amicus.

Charles F. Holum, for National Farmers Union (Canada), amicus.

David G. Velde, Gaffaney & Velde, Alexandria, MN, for National Farmers Union, amicus.

Charles F. Holum, Denver, CO, for Rocky Mountain Farmers Union, amicus.

Page Dringman, Browning, Kaleczyc, Berry & Hoven, P.C., Helena, MT, for Crazy Mountain Farmers Stockmen Association, amicus.

Jay N. Galt, Marjorie McCullough, White, Coffey, Galt & Fite, Oklahoma City, OK, for Oklahoma State Union of the Farmers Educational and Cooperative Union of America, amicus.

Robert D. Blackman, Colorado Cattlemen's Association, Pueblo, CO, for Colorado Cattlemen's Association, amicus.

Randy Beard, Beard & Beard, Guntersville, AL, David A. Bradsky, Bradsky, Bradsky & Bradsky, PC, Rapid City, SD, for American Cowman's Association, amicus.

## MEMORANDUM OPINION AND ORDER

ALBRITTON, Chief Judge.

### I. INTRODUCTION

This cause is before the court on a Motion for Class Certification filed by Henry Lee "Leroy" Pickett, Sam Britt, Paul Horton, Mike Callicrate, Jim Bower, Pat Coggins, Johnny Smith, Stayton Weldon, Lovel Blain, and David Smith (collectively "the Plaintiffs").

The Plaintiffs originally filed their Complaint in this case on July 11, 1996. The Plaintiffs allege that Iowa Beef Processors, whose corporate name is IBP, inc., ("IBP") has violated the Packers and Stockyard Act of 1921, 7 U.S.C. § 181 et seq. (1980).

IBP filed a Motion to Transfer Venue which this court denied in a Memorandum Opinion and Order entered on March 13, 1997. The Plaintiffs subsequently filed a Motion for Class Certification and the court held oral argument on the Motion.

For reasons to be discussed, the Motion for Class Certification is due to be DENIED.

### II. FACTS

According to the Plaintiffs there are four major beef processors or packers which account for 85 to 92 percent of the American market for beef cattle. The Plaintiffs are bringing claims against only one of these packers, IBP. The Plaintiffs claim that IBP has violated the Packers and Stockyards Act ("P & S Act").

The Plaintiffs allege that the packers assembled a large supply of cattle for slaughter, which the Plaintiffs refer to as "captive supply." As the Plaintiffs explain it, IBP and the other packers set an unfair and unreasonably low price for cattle and when the Plaintiffs reject the low price, IBP and the other three packers slaughter cattle from their own captive supply and/or exclusive marketing agreements, and leave the Plaintiffs without a buyer for their cattle, so that the Plaintiffs have to accept the lower price.

The Plaintiffs also contend that cattle producers who supply cattle to IBP through exclusive marketing/purchaser contracts receive preferential treatment because they receive a higher price for their cattle and are also provided a constant, ready market for their cattle. The Plaintiffs state that the price paid for beef cattle has decreased due to IBP's and the other packers' practices, but that IBP has had record profits. The Plaintiffs point to filings made by IBP as evidence that IBP had increased profits in 1994, 1995, and 1996.

Cattle producers basically fall into three categories: cow-calf producers, stockers, and finishing producers or feed lot operators. Each of the named Plaintiffs in this case fall into at least one of these categories: Pickett is a backgrounder or stocker who sometimes retains title to the cattle which are sold by the feed lot to IBP; David Smith is a cow-calf producer who also grazes feeder steers; Weldon is a cow/calf producer who sells through auction or an association sale; Blain is a cow/calf producer who sells through auction and who also sells heifers through private agreement; Horton has stocker and feeder calves, some of which he retains and some of which he sells as finished cattle; Goggins is a cow/calf producer and also a

stocker; Callicrate is a feed yard operator, Britt is a cow/calf producer and a stocker, he raises yearlings and sells them to a feeder; and Bowers and Johnny Smith are cow-calf producers, stockers or feedlot operators.

IBP contends that the price of beef has been determined by market forces and not by IBP's alleged captive supply of cattle. IBP states that the price of cattle is affected by many factors such as sex, breed, grade, yield grade, weights, age, negotiating skills of the buyer, the order in which pens are sold, and the length of the contract. IBP states that the price of fat cattle has declined as a result of a twenty-year high in the supply of cattle and that its profits are razor thin and were affected by a number of factors. IBP contends that because of the varied nature of the factors which must be evaluated for the Plaintiffs to prove their claims, proof on a class-wide basis is not possible.

### III. STANDARD FOR CLASS CERTIFICATION

■ The question of class certification is a procedural one distinct from the merits of the action. *Garcia v. Gloor*, 618 F.2d 264 (5th Cir.1980).[1] In deciding whether to certify a class, a district court has broad discretion. *Washington v. Brown & Williamson Tobacco Corp.*, 959 F.2d 1566 (11th Cir.1992). Although a district court is not to determine the merits of a case at the certification stage, sometimes "it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question." *Washington*, 959 F.2d at 1570 n. 11.

■ A class action may only be certified if the court is satisfied, after a rigorous analysis, that the prerequisites of Federal Rule of Civil Procedure 23 have been satisfied. *Gilchrist v. Bolger*, 733 F.2d 1551, 1555 (11th Cir.1984). "A class action may be maintained only when it satisfies all the requirements of Fed.R. of Civ.Pro. 23(a) and at least one of the alternative requirements of Rule 23(b)." *Jackson v. Motel 6 Multipurpose, Inc.*, 130 F.3d 999 (11th Cir.1997). A court must evaluate whether the four requirements

of Rule 23(a) are met: numerosity, commonality, typicality, and adequacy of representation. Furthermore, the court must determine whether the action may be maintained as one of the classes under Rule 23(b). The party seeking to maintain the class action bears the burden of demonstrating that all prerequisites to class certification have been satisfied. *Walker v. Jim Dandy Co.*, 747 F.2d 1360, 1363 (11th Cir.1984).

### IV. DISCUSSION

In considering the multiple briefs submitted to the court, including amicus curiae briefs, and the oral arguments of the parties, the court has been struck by the divergence of views on what the class' theory of liability is and how the class would be managed. The Plaintiffs have taken a broad view and have urged this court to address this case in two stages: first as to liability and then as to what the class members are due. IBP, on the other hand, has specifically identified areas where it contends that questions of liability and individual damages are inextricably intertwined. Amicus curiae briefs have urged this court to certify a class action because of the harm that has allegedly been done to the cattle industry by IBP's purportedly unfair practices and the need for complete relief of the class members from this harm. In ruling on the motion for class certification, the court makes no determination as to whether IBP has acted lawfully or fairly. At this stage in the proceedings, this court's only role is to determine whether the class action proposed by the Plaintiffs meets the requirements of Rule 23 of the Federal Rules of Civil Procedure.

#### A. Requirements of Rule 23(a)

The prerequisites for a class action under Rule 23(a) are that (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and ade-

---

1. In *Bonner v. City of Prichard, Alabama*, 661 F.2d 1206 (11th Cir.1981) (*en banc*), the Elev- enth Circuit adopted as binding precedent the decisions of the former Fifth Circuit.

quately protect the interests of the class. Fed.R.Civ.Pro. 23(a).

### 1. Numerosity

■ The Plaintiffs have stated that because there are several hundred thousand cattle producers throughout the United States who are a part of the purported class, the large number and geographical diversity of the purported class satisfies the numerosity requirement. IBP does not challenge the Plaintiff's ability to meet the numerosity requirement, and in fact states that the putative class in this case could exceed one million members. Given the large number of putative class members and the fact that they are apparently geographically dispersed, the court finds that the numerosity requirement has been met. *See* Wright, Miller & Kane, Federal Practice and Procedure: Civil 2d § 1762 (citing cases where Rule 23(a)(1) has been satisfied where there were thousands of members in the class).

### 2. Commonality

■ Rule 23(a) requires that there be common questions of law or fact common to the class. Fed.R.Civ.Pro. 23(a). The Plaintiff has cited *Kirkpatrick v. J.C. Bradford & Co.*, 827 F.2d 718 (11th Cir.1987), for the proposition that common questions of law or fact are involved where allegations of wrongdoing involve a common course of conduct. In this case, the Plaintiffs' contention is that various practices of IBP violated the Packers and Stockyard Act and caused injury to the purported class. IBP does not appear to question that there are common questions of law or fact, arguing instead that there are numerous and significant differences between class members which overwhelm this commonality. Although differences among the class members are relevant under other Rule 23 requirements, differences among class members does not necessarily undermine commonality as long as the resolution of the common questions affects all or a substantial number of class members. *See Shipes v. Trinity Industries*, 987 F.2d 311, 316 (5th Cir.1993), *cert. denied*, 510 U.S. 991,

114 S.Ct. 548, 126 L.Ed.2d 450 (1993). Accordingly, the court finds that the commonality requirement has also been met.

### 3. Typicality and Adequacy

One primary focus of IBP's challenge to certification of a class in this case stems from purported conflicts of interest identified by IBP. This challenge implicates both the typicality and adequacy requirements, which is not unusual. *See Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 117 S.Ct. 2231, 2250 n. 20, 138 L.Ed.2d 689 (1997) ("the adequacy-of-representation requirement tends to merge with the commonality and typicality criteria . . .").

■ Under the typicality requirement, a class representative's claims or defenses must be typical of the claims or defenses of the class. Fed.R.Civ.P. 23(a)(3). In other words, there must be a nexus between the class representative's claims or defenses and the common questions of fact or law which unite the class. *See Kornberg v. Carnival Cruise Lines, Inc.*, 741 F.2d 1332 (11th Cir. 1984). A sufficient nexus is established if the claims or defenses of the class and the class representatives arise from the same event or pattern or practice and are based on the same legal theory. *Id.* at 1337.

■ Under the adequacy of representation requirement, representative plaintiffs must fairly and adequately protect the interests of the class. Fed.R.Civ.P. 23(a)(4). The adequate representation inquiry involves questions of whether the Plaintiffs' counsel are qualified, experienced, and generally able to conduct the proposed litigation,[2] and of whether the Plaintiffs have interests antagonistic to those of the rest of the class. *Griffin v. Carlin*, 755 F.2d 1516, 1533 (11th Cir. 1985).

■ In this case, the Plaintiffs contend that their claims are typical of the purported class because they are all based on an identical theory of unfairness which allegedly violated the P & S Act. IBP argues in response

---

**2.** IBP does not appear to challenge the adequacy of class counsel; furthermore, the Plaintiffs have demonstrated that they are represented by counsel with substantial experience in complex litigation and class actions.

that numerous and significant conflicts of interest undermine the typicality of the Plaintiffs' claims and the ability of the Plaintiffs to adequately represent the interests of the class.

IBP lists the conflicts of interest as being that (1) buyers of cattle have conflicts with sellers of cattle, (2) plaintiffs who sell under the cash method have conflicts with plaintiffs who sell under captive supply agreements, (3) plaintiffs who sell on the cash method have conflicts with other plaintiffs selling on this method, and (4) plaintiffs selling under captive supply agreements have conflicts with other plaintiffs selling under captive supply agreements. According to IBP, nine of the ten named plaintiffs sell almost exclusively on the cash method and wish marketing agreements to be declared unlawful, but one class representative, and presumably other putative class members, sell using yield and grain agreements.

IBP states that plaintiffs who buy cattle cannot represent plaintiffs who sell cattle because class members at each level of production will claim that they were paid too little when they sold cattle to another class member, but paid the right amount when they bought cattle from a class member. IBP cites to precedent from other jurisdictions for the proposition that seller-purchaser conflicts raise questions about the adequacy of representation of all class members. For instance, the court in *In re Seagate Tech. II Sec. Litig.*, 843 F.Supp. 1341 (N.D.Cal.1994), determined, within the context of a securities claim, that a seller-purchaser conflict posed a problem which could not be satisfied by either bifurcation or subclasses.

As to Plaintiffs who sell in the cash market representing Plaintiffs who sell on marketing agreements, IBP states that these Plaintiffs' interests are antagonistic because Plaintiffs who sell on agreements received more money than Plaintiffs who sell in the cash market. One of the named Plaintiffs in this case, Mike Callicrate, sells on marketing agreements, while the other named Plaintiffs sell in the cash market. In fact, one of the Plaintiffs' theories is that IBP gave preferential treatment to some cattle purchasers.

While the Plaintiffs do not dispute the existence of the differences which IBP has pointed to, the Plaintiffs argue that alleged conflicts of interest identified by IBP only appear to be conflicts of interest because IBP does not understand the Plaintiffs' claim and theory of damages. According to the Plaintiffs, IBP damaged all of the class members by paying an unfair price for cattle and the differences between the class members are relevant only to the allocation of damages due as a result of IBP's violation of the P & S Act. According to the Plaintiffs, this case should proceed in two stages: Stage I to determine that IBP violated the statute and the total amount of IBP's liability, and Stage II, to determine the damages to be awarded to particular class members. The Plaintiff argues that the court should be guided by employment discrimination cases where, even if there is more than one class member who claims that he or she should have been hired for the same job, the class is certified, and the damages issue is settled after liability is determined.

As the court understands it, the Plaintiffs intend to show that IBP earned unfair profits. The Plaintiffs have provided the testimony of Walter Mack Myers in which he states that, with the evidence that he has now, it is his opinion that the difference between IBP's profits in 1993 and later years will be determined to be an unfair profit which should be disgorged to the class members. Myers Affidavit, page 6. Myers states that the damages in this case can be calculated by returning to the class the amount of profit that IBP received which is beyond what is fair. *Id.* Under this theory, the Plaintiffs argue, all cattle producers are united in their claim that IBP engaged in practices which unfairly set the price of finished cattle.

This theory is deceptively simple and seems at first glance to meet the Rule 23 requirements; however, the court has several concerns with this theory. One significant problem that the court sees with this theory is that it glosses over the importance of apparent conflicts of interest for the liability determination.

The court is concerned first that conflicts exist between class members who received an advantage and those who were disadvantaged and that these conflicts are relevant at the liability stage, not just the damages stage. In the Complaint, and throughout submissions on the issue of class certification, the Plaintiffs continue to assert a claim that IBP engaged in conduct that gave "undue or unreasonable preference or advantage to any particular person or locality." Submission in Support of Class Certification, page 10. If the named Plaintiffs intend to represent all cattle producers, then, necessarily, some putative class members will be asserting that some other class members were advantaged by IBP's conduct, creating inter-class conflicts. In fact, the Plaintiffs have pointed specifically to Paul Engler as a class member who has been given preferential treatment and have stated that giving preferential treatment to Engler has allowed IBP to have a captive supply of cattle. Plaintiffs' Reply Memorandum at page 11. It is also apparently undisputed that at least one named Plaintiff, Mike Callicrate, sold cattle by way of marketing agreements.

Other courts have found that Rule 23 requirements are not satisfied where some class members are given an advantage, while others are put at a disadvantage. *See Bieneman v. City of Chicago*, 864 F.2d 463 (7th Cir.1988) (affirming denial of class certification where some members of the class derived great benefit from challenged actions while others were harmed). In *Auto Ventures v. Moran*, No. 92–426–CIV–KEHOE, 1997 WL 306895 (S.D.Fla. April 3, 1997), the court reasoned that the plaintiffs' theory that the defendants applied coercion by rewarding dealerships that cooperated and penalizing dealerships that did not cooperate resulted in a "sharp dichotomy of experience within the dealership body." *Id.* at *4. The court explained that, as a practical matter, penalized dealers would be forced to argue that some class members received benefits, not damages. *Id.* Similarly, under the Plaintiffs' theory in this case, especially the claim that IBP unduly favored some cattle producers, to show that IBP violated the P & S Act, some Plaintiffs will have to argue that other Plaintiffs received benefits. This undermines both typicality and adequacy of representation. *Cf. Katz v. Comdisco, Inc.*, 117 F.R.D. 403, 408 (N.D.Ill.1987) (named plaintiff was inadequate representative where benefitted from the allegedly fraudulent scheme).

The Plaintiffs have attempted to answer this problem by arguing that to the extent that some class members were advantaged, rather than injured, those class members simply will not make a claim for damages in the second stage of the trial. Plaintiffs' Reply Memorandum at page 15. This response appears to create at least two problems with the Plaintiffs' theory. First and foremost, this theory would require the cattle producers themselves to determine who was injured or who was aided by IBP's forward contracting. Since this court cannot rely on the acumen of cattle producers to self-select out of a class, especially since there appears to be disagreement as to which contracts with IBP were violative of the Act, this court would have to engage in an inquiry of determining who was damaged, even if it accepted the Plaintiffs' bifurcation theory. Second, if any of the named Plaintiffs, specifically Callicrate, are those who were advantaged, they do not have Article III standing. *Griffin v. Dugger*, 823 F.2d 1476 (11th Cir.1987).

Given that the Plaintiffs' own claims for relief demonstrate that there are conflicts between advantaged and disadvantaged class members, the court cannot conclude that these class conflicts are insignificant and may be disregarded until a separate stage of the proceedings. The court notes that the Plaintiffs have stated that "[t]o the extent that IBP has created differences among class members through its illegal conduct, it should not be allowed to prevent class certification." Plaintiffs' Reply Memorandum, page 11 n. 3. It is not IBP's responsibility, however, to define the class. The conduct allegedly engaged in by IBP occurred prior to the filing of this case, not in an effort to defeat class certification.

The court also notes that the Plaintiffs have suggested that subclassing might be employed to avoid certification problems. The Plaintiffs have not, however, identified the subclasses which could be made to allevi-

ate the concerns identified by this court. *See In re Industrial Gas Antitrust Litigation*, 100 F.R.D. 280, 300 (N.D.Ill.1983) (court did not sub-class because was "at a loss as to how sub-classing would be of assistance in this particular lawsuit"). If this court were to divide the putative class into a class of persons who were advantaged by IBP's conduct and a class of persons who were disadvantaged, then the advantaged persons would have no standing to bring a claim against IBP. Without further guidance from the Plaintiffs, the court is at a loss for how to sub-class so as to avoid a conflict of interest between persons who some of the class members contend were advantaged by some of IBP's practices. The court also is at a loss for how to more narrowly define the class. Although given the opportunity to provide the court with some guidance as to how the class definition could be refined, the Plaintiffs only informed the court that the amount of damages would remain the same regardless of who was in the class. This makes some sense, since people who were actually advantaged would not be allowed to take a share of the class' damages, but this explanation undermines certification of the class as defined, because people who suffered no injury are included in the class.

The second significant problem that the court sees with the Plaintiffs' theory is that even if the court ignored the Plaintiffs' claim based on advantaged cattle producers, the court is not persuaded that the Plaintiffs have adequately demonstrated that they will be able to prove their theory in two completely separate stages. That is, while the Plaintiffs have argued that liability can be determined for the whole class without individual consideration of claims, the Plaintiffs have not adequately demonstrated how this will be accomplished.

■ The Eleventh Circuit has, in the context of a manageability discussion, favorably cited precedent establishing that where serious problems appear, a court should not certify the class merely on the assurance of counsel that some solution will be found. *Andrews v. American Telephone & Telegraph Company*, 95 F.3d 1014 (11th Cir. 1996). This reasoning also applies to the issues of typicality and adequacy of representation in this case because the Plaintiffs have relied on expert testimony to show that they will be able to prove a single amount of damages, irrespective of the number, amount, or complexity of individual claims. Although the Plaintiffs have been given an opportunity to describe to the court how they will calculate the amount of liability that they contend is due to IBP's purportedly unfair practices, the Plaintiffs appear to concede that they have not fully developed this theory, aside from the question of whether they have found evidence to support the theory, because they have represented to the court that additional experts will be consulted to determine the price for finished cattle which would have been competitively paid so as to compare the price that was paid by IBP. Plaintiff's Reply Memorandum, page 13 n. 5. Because the Plaintiffs' theory hinges on their ability to prove the issue of liability separately from the individual questions of damages, the court is hesitant to certify a class based on the assurance that experts who will be consulted in the future will be able to provide the framework of analysis for assessing the total amount of damages at the liability stage.

The lack of guidance is only part of the problem in establishing liability with classwide proof, however. Assuming that the Plaintiffs will be able to demonstrate that the profits IBP received exceeded the profits they would have received had market forces determined the price of cattle, that proof will establish the total amount of damages owed by IBP. That proof will not, however, prove that there was a violation of the P & S Act. Without inquiring into the merits of the Plaintiffs' claims, the Plaintiffs have not cited to caselaw, nor did they appear to contend, that evidence of profits is sufficient to prove a violation of the Act. As explained by the Tenth Circuit, the words "unfair, unjustly discriminatory, or deceptive practice or device" as used in the Act are not defined. *See Capitol Packing Co. v. United States*, 350 F.2d 67 (10th Cir.1965). In *Capitol Packing Company*, the court explained that "specified methods of dealing which are not themselves violations of the Act cannot, when added together, become a violation.... In order

for a violation of [the Act] to be committed, a specified manner of dealing must be found to be unfair or deceptive." *Id.* at 77. In fact, while the Plaintiffs have pointed to the unfair profits, they have also provided the testimony of Myers that in his opinion, IBP's use of captive supply through forward contracts and other practices allowed IBP to offer a price for slaughter cattle that was lower than the value of the cattle. *See* Myers Affidavit. In other words, the Plaintiffs appear to recognize that they must show that IBP's practices violated the Act, resulting in the unfair profit that they wish to identify.

To prove that these practices violated the Act, it appears that the Plaintiffs will not be able to rely on proof which is applicable to the entire class. The Plaintiffs will have to show that IBP used practices such as forward contracts and marketing agreements to force cattle producers to accept a lower price. The Plaintiffs argue that the persons selling cattle by the cash method were forced to accept prices below the value of the cattle because IBP secured cattle by the use of contracts and marketing agreements. Consequently, the Plaintiffs will have to prove that the cash method sales were influenced by these agreements. As to the claim that IBP made unduly favorable agreements with some putative class members, terms of those agreements apparently will have to be compared with other agreements and evaluated for their fairness. In short, to prove that there was a violation of the P & S Act which allowed IBP to earn its profits, the Plaintiffs will have to do more than provide evidence to establish their, as yet undefined, economic model. They will have to show that particular cattle transactions were conducted in a way that allowed IBP to "unfairly" set the price of slaughter cattle within the meaning of the P & S Act.

Not only does the proof that will be required demonstrate that the Plaintiffs' bifurcation theory cannot avoid typicality-defeating conflicts, it also appears to reveal another source of conflicting interests. As was earlier discussed, Mike Callicrate sold cattle by use of grade and yield agreements. It appears, therefore, that named Plaintiff Callicrate not only has an adverse interest to other class members which will affect damage calculations, but that this named plaintiff has conflicts with other plaintiffs as to the practices of IBP which violated the P & S Act. The fact that the class has been so broadly defined as to include cattle producers who sold cattle to IBP by way of contracts and marketing agreements means that the liability inquiry will require separate determinations of which selling agreements were unfair. In short, while the Plaintiffs contend that unfair profits as a whole can be determined and then damages can be allocated on an individual basis, the differences in theory represented by different named plaintiffs, and the differences between class members, are relevant to more than just damages determinations. These differences are also relevant to the separate inquiry as to the practices of IBP which were unfair.

While the individual named Plaintiffs may ultimately prevail on their theory of liability at trial, the court must conclude that the class has been so broadly defined, with no readily-apparent way to more narrowly draw it, so as to include persons who have adverse interests to other class members. Although the Plaintiffs have argued that these conflicts are not important because liability can be assessed with common evidence in a separate stage of the proceedings, the Plaintiffs' theory requires proof that particular cattle transactions were conducted in a way to reduce the price paid for slaughter cattle. Even relying solely on the Plaintiffs' theory, the court will not rely on a trial strategy to confront significant class certification problems based only on assurances that the expert testimony will prove the theory.

### B.  Rule 23(b)

Even if the court were to overlook the Plaintiffs failure to establish typicality and adequacy, as will be explained below, the class is not due to be certified under either of the Rule 23(b) subsections. The Plaintiffs have requested in their Motion for Class Certification that the court certify a class under the terms of Federal Rule of Civil Procedure 23(b)(2). The Plaintiffs have also argued in their Brief in Support of Class Certification that, although they seek monetary damages, they predominantly seek de-

claratory and injunctive relief with respect to the class as a whole, so that the class should be certified under Rule 23(b)(2).

After filing and briefing their Motion for Class Certification under Rule 23(b)(2), Plaintiffs filed an Amended Complaint which adds an assertion that certification is also appropriate under Rule 23(b)(3). The Plaintiffs also made arguments relevant to Rule 23(b)(3) in subsequent submissions and in oral argument. Since all parties have briefed and argued the application of both sub-sections of the rule, the court will treat the Amended Complaint as having amended the Motion for Class Certification to add Rule 23(b)(3). Therefore, the court will address certification under each aspect of the rule separately.

### 1. Rule 23(b)(2)

The Plaintiffs have requested that this court certify a class under Rule 23(b)(2) for injunctive or declaratory relief. At oral argument, this court expressed concern to the attorneys for the Plaintiffs that injunctive relief might not be within the discretion of this court since the statute provides only for money damages on its face; stating that any person liable to a person or persons injured under the statute shall be liable "for the full amount of damages sustained in consequence of such violation." 7 U.S.C. § 209(a).

IBP has argued that the P & S Act allows an injured party to proceed against a violator of the Act either by complaint to the Secretary under § 210 or by suit in district court. 7 U.S.C. §§ 209(b), 210. In § 216 of the Act, the statute provides that the Secretary, an injured party, or the United States by its Attorney General, may seek an injunction against covered persons who fail to obey any order of the Secretary. 7 U.S.C. § 216. Thus, an injured party who proceeds before the Secretary and obtains an order under § 210 may then seek an injunction in court. IBP contends that since Congress provided this specific mechanism for obtaining an injunction, this court should find that injunctive and declaratory relief are not available under 7 U.S.C. § 209.

At the invitation of this court, Daniel R. Glickman, United States Secretary of Agriculture, has filed an amicus curiae brief on the issue of relief which is available to the Plaintiffs under the P & S Act. According to Secretary Glickman's interpretation of the P & S Act, a district court has the discretion to fashion injunctive and/or declaratory relief under 7 U.S.C. § 209. Secretary Glickman disagrees with IBP's argument that § 216 of the P & S Act would be rendered mere surplusage under the Plaintiff's interpretation. Secretary Glickman states that the only section of the P & S Act which gives a private right of action against packers is § 209, so that the relief afforded under § 209 has no relationship to the relief which may be afforded under § 216. In other words, because other sections allowing for injunctive relief by private right of action do not apply when the relief is sought against a packer, they do not preclude an interpretation that injunctive relief is available in the section providing for a private right of action against the packer.

Before the issue of the relief available to the Plaintiffs under § 209 becomes relevant, however, the court must determine whether the relief sought may properly be certified as a Rule 23(b)(2) action. "Rule 23(b)(2) is not applicable to cases in which appropriate relief relates exclusively or predominantly to money damages." *Collins v. International Dairy Queen, Inc.*, 168 F.R.D. 668, 675 (M.D.Ga.1996); *see also* 1 Herbert B. Newberg & Alba Conte, *Newberg on Class Actions* § 4.12 (3d ed.1992). Therefore, the court must determine whether the primary relief sought by the Plaintiffs is injunctive or declaratory relief, not monetary damages. The Plaintiffs have requested equitable relief, but have also requested compensatory and punitive damages. IBP points out that the Plaintiffs are asking for hundreds of millions of dollars and contends that this request for actual damages overwhelms the injunctive relief which is sought.

The court first notes that although the Plaintiffs have sought disgorgement of unfair profits, and although disgorgement is an equitable remedy, this remedy does not qualify as injunctive relief. *Sugai Products, Inc. v. Kona Kai Farms, Inc.*, No. 978–43–SPK, 1997 WL 824022 (D.Hawai'i Nov. 19, 1997)

(finding that the claim for disgorgement of profits predominates and cannot be the basis for certification under Rule 23(b)(2) because not injunctive relief). Therefore, the Plaintiffs request for compensatory and punitive damages, whether stemming from disgorgement or not, is not the type of relief contemplated by Rule 23(b)(2).

■ Class certification under Rule 23(b)(2) is improper if the exclusive or predominant relief sought in the action is monetary damages. *See* Advisory Committee Notes on Rule 23(b)(2). The determination of which type of relief is predominant is a matter within the sound discretion of the court. *Celestine v. Citgo Petroleum Corp.,* 165 F.R.D. 463 (W.D.La.1995).

■ After the parties submitted their arguments and evidence to this court, and after oral argument was held in this case, the Fifth Circuit decided a case in which it set forth a thorough and well-reasoned explanation of what "predominant" relief is under Rule 23(b)(2). *See Allison v. Citgo Petroleum Corp.,* 151 F.3d 402 (5th Cir.1998). This court is persuaded by the reasoning of the Fifth Circuit and is convinced that the Eleventh Circuit would also apply similar analysis.

In *Allison,* the Fifth Circuit explained that the predomination requirement of Rule 23(b)(2) serves two purposes: it protects the legitimate interests of potential class members who might wish to pursue their monetary claims individually, and it preserves the legal system's interest in judicial economy. *Id.* at 414. Based on these two interests, the Fifth Circuit held that "monetary relief predominates in (b)(2) class actions unless it is incidental to requested injunctive or declaratory relief." *Id.* In defining what "incidental" means in this context, the court reasoned that incidental damages are in the nature of a group remedy and that they should only be damages to which class members automatically would be entitled once liability to the class as a whole is established. *Id.* The Fifth Circuit determined that incidental damages are damages that flow directly from liability to the class as a whole on the claims forming the basis of the injunctive or declaratory relief. *Id.* Liability for "incidental

damages should not require additional hearings to resolve the disparate merits of each individual's case; it should neither introduce new and substantial legal or factual issues, nor entail complex individualized determinations." *Id.*

The damages inquiry in this case, if the class were certified, would be exceedingly complex and would involve new and substantial legal and factual issues. The Plaintiffs' request for compensatory and punitive damages on behalf of each class member would require individualized proof and determinations. Because the monetary relief is not "incidental," the requested injunctive or declaratory relief is not predominant and, therefore, cannot provide a basis for certification under Rule 23(b)(2). *See id.* at 418 ("Given the degree to which recovery of compensatory and punitive damages requires individualized proof and determinations, they clearly do not qualify as incidental damages in this case."); *see also Wilcox Development Company v. First Interstate Bank of Oregon,* 97 F.R.D. 440 (D.Or.1983) (certification not proper under 23(b)(2) because while plaintiffs sought an injunction, money damages represent the major portion of the relief sought). Because the class cannot be certified as a Rule 23(B)(2) class, the court need not decide at this stage whether the Plaintiffs, if they prevail on the liability issues, will be entitled to both injunctive and declaratory relief.

### b. Rule 23(b)(3)

■ As explained above, the Plaintiffs have also sought certification of the class under Rule 23(b)(3). The particular requirements of Rule 23(b)(3) are that the common questions of law or fact "predominate" and that the class action procedure be "superior ... for the fair and efficient adjudication of the controversy." Factors which enter into this include (1) the interests of individuals in controlling their own case, (2) the extent of any pre-existing litigation, (3) the desirability of concentrating litigation in one forum, and (4) the difficulties likely to be encountered in the management of a class action. Fed. R.Civ.Pro. 23(b)(3).

As to the predominance requirement, in order to qualify as a 23(b)(3) class, "the

issues in the class action that are subject to generalized proof, and thus applicable to the class as a whole, must predominate over those issues that are subject only to individualized proof." *Jackson v. Motel 6 Multipurpose, Inc.*, 130 F.3d 999, 1005 (11th Cir.1997). The particular inquiry is " 'far more demanding' than Rule 23(a)'s commonality requirement." *Id.* (quoting *Amchem,* 117 S.Ct. at 2249–50 (1997)).

IBP has argued that the Plaintiffs cannot demonstrate on behalf of the class that there is a violation of the statute and that the Plaintiffs have suffered an impact of this violation. In so arguing, IBP points to anti-trust cases which have held that individual questions predominate where violation could be proven on a class-wide basis, but individual impact could not. The Plaintiffs' response is that they are not pursuing an anti-trust claim. The Plaintiffs state that the Packers and Stockyard Act is often considered to be broader than the anti-trust statutes.

Under the Packers and Stockyard Act, "[i]f any person subject to this chapter violates any of the provisions of this chapter … he shall be liable to the person or persons injured thereby for the full amount of damages sustained in consequence of such violation." 7 U.S.C. § 209. This provision is similar to the provision of the Clayton Act which states that "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor." 15 U.S.C. § 15. The Clayton Act provision has been construed to require proof, not only of a violation of antitrust laws, but also of the fact of damage. *State of Alabama v. Blue Bird Body Company, Inc.*, 573 F.2d 309 (5th Cir.1978). Accordingly, in anti-trust cases, courts routinely deny class certification even where violation can be shown on a common basis, if impact cannot be proven with class-wide proof.

It appears that no court has ever addressed whether a claim under the P & S Act requires the same proof as a claim under the anti-trust statutes. The statutory language is so similar, however, that it appears that both violation and impact are required before there can be a finding of liability under the P & S Act. If such a showing were required, this court would conclude that the Plaintiffs have failed to meet their burden in moving for class certification because of complex individual questions which would be involved in a determination of impact. The court need not decide whether the P & S Act requires proof of violation and impact, however, because, as has been previously discussed, the Plaintiffs have failed to show that their theory will allow for class-wide proof of violation of the Act.

As discussed earlier, the Plaintiffs have attempted to alleviate problems with certifying the class by dividing the case into two stages. The Plaintiffs' expert, Walter Myers, states that "to the extent that IBP received more than a fair return on its cattle business, it received an unfair return, and therefore engaged in an unfair practice." Affidavit of Walter Myers. The Plaintiffs apparently recognize, however, that merely stating that IBP received an "unfair" profit does not establish that there was a violation of the P & S Act, since the Plaintiffs have attempted to point to practices whereby IBP achieved its profit levels. In other words, although the Plaintiffs state that there is a straightforward way to calculate damages in this case, unfair profit minus fair profit, such a calculation is only a determination of damages, it does not establish that there was a violation of the P & S Act. While the Plaintiffs may believe that the profit IBP received in the relevant years is "unfair," they have not cited any precedent establishing that this belief means that the P & S Act has been violated. Nothing in our system of jurisprudence recognizes the making of an "unfair" profit, in and of itself, as a basis for liability in any context. Without getting into the merits of the Plaintiffs' theory, it appears to this court that the alleged difference between unfair and fair profits is at most evidence that IBP was engaged in an unfair practice, although that is certainly not necessarily the case. There could be any number of explanations for why IBP had increased profits. Therefore, it appears to this court that for common issues to predominate, there must be a way to prove on a class-wide basis that IBP engaged in practices which would be considered to be unfair under the P & S Act.

The evidence provided to the court thus far in the proceedings establishes that there are numerous factors which are considered when cattle are purchased. Additionally, all persons who sold cattle during the relevant period did not sell directly to IBP. While the Plaintiffs state that IBP's practices affected prices on all levels of cattle production, each level of production applies factors which presumably affect price and could counteract or exacerbate the effect of IBP's practices. In short, although the Plaintiffs have attempted to simplify the inquiry before the court, the court cannot find that there is a method by which violation of the Act can be determined without consideration of individual transactions.

Another problem with the Plaintiffs' theory is that even assuming that only damages issues would require individualized proof, the damages inquiry itself undermines the predominance element in this case. Where individual damages must be calculated there must be common issues of liability which predominate. *See e.g., In re South Central States Bakery Products Antitrust Litigation,* 86 F.R.D. 407 (M.D.La.1980). Another district court analyzed the question of predominance within the context of a damages determination, separate from the issue of injury, in an anti-trust case. *See Butt v. Allegheny Pepsi–Cola Bottling Company,* 116 F.R.D. 486 (E.D.Va.1987). The court reasoned that because the plaintiff failed to demonstrate that damages could be determined by a formula and because damage computations would be a complex, highly individualized task, the damages calculation imposes an intolerable burden on the judicial system. *Id.* at 492. The court also concluded that where there is substantial evidence of serious problems in calculating damages, the court should not certify the class merely on the assurance that a solution will be found. *Id.* Another district court similarly concluded that individual issues of class membership, injury, and damages predominated where there was no damages formula and determinations of each individual's claims could take years. *Wilcox Development Co. v. First Interstate Bank of Oregon,* 97 F.R.D. 440 (D.Or.1983). The court agrees with the reasoning of these courts and finds that the damages calculation

in this case would be so complicated that the court cannot certify this class based only the Plaintiffs assurance that a bifurcated trial will solve certification problems, without any discussion of how such determinations will be made in the second stage. *See Celestine v. Citgo Petroleum Corp.,* 165 F.R.D. 463, 471 (W.D.La.1995) (finding that plaintiffs did not show bifurcation would remove complexity, especially since "[o]ther than a generalized claim that bifurcating the trial into liability and damage stages would be helpful, the plaintiffs have offered no specific methods for handling the various issues and theories alleged in this action.").

In addition, the individualized factual and legal determinations that will have to be made to determine liability and damages makes this case unmanageable. The Eleventh Circuit has made it clear to district courts that courts should be concerned about the manageability of class actions and should not overlook the problems in managing a case, even if the claims otherwise meet Rule 23. For instance, in 1996, the Eleventh Circuit reversed a trial court's certification of two class actions in *Andrews v. American Tel. & Tel. Co.,* 95 F.3d 1014 (11th Cir.1996). In doing so, the Eleventh Circuit held that the class would satisfy concerns of standing and the requirements of Rule 23(a), but that it was still an abuse of discretion for the district to certify a class, given the problems in managing the class actions. *Id.* The Eleventh Circuit explained that taking into account the " 'whole range of practical problems that may render the class action format inappropriate for a particular suit,' " the district court had "underestimated the management difficulties that would persist as these suits proceeded as class actions." *Id.* at 1023 (quoting *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 164, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974)). In *Andrews,* the plaintiffs made an argument similar to the argument advanced in this case, that is, that although specific programs vary in exact content, the predominant issues of the legality of the basic methods of solicitation and operation of the programs and the basic wrong suffered by the class members could be assessed on a classwide basis. *Id.* at 1023. The Eleventh Cir-

cuit found that in accepting this argument, the district court had underestimated the management difficulties that would persist as these suits proceeded as class actions. *Id.*

In this case, IBP argues that the court will be forced to conduct thousands of mini-trials to determine whether IBP gave preference to a feedyard, whether IBP entered into each marketing agreement without a legitimate business purpose, and other issues, as well as whether each plaintiff has suffered monetary injury. IBP states that in response to an Order by Magistrate Judge Coody to provide an economic model, the Plaintiffs have provided a "fluid recovery" model that impermissibly compares IBP's 1993 gross profits with its gross profits in the period between 1994 and 1996 and claims that the difference should be disgorged to the Plaintiffs.

Whether or not the Plaintiffs' model is based on an impermissible theory of recovery, the Plaintiffs have not shown that they will be able to prove violation of the P & S Act without inquiring into particular cattle transactions. Furthermore, individual questions which must be resolved as to the damages issues alone, such as which class members were injured and the price that individual class members should have received for the cattle they sold at various stages in cattle production, would themselves be unmanageable. *See Mack v. General Motors Acceptance Corp.*, 169 F.R.D. 671 (M.D.Ala.1996) (resolution of damages adds to the unmanageability of the class). Even if the Plaintiffs could successfully confine individual questions to the damages inquiry, courts have concluded that a damages determination, separate from any question of violation, which cannot be made by use of a mathematical formula, but which involves individualized determinations is unmanageable. *Butt*, 116 F.R.D. at 494; *cf. In re Domestic Air Transportation Antitrust Litigation*, 137 F.R.D. 677 (N.D.Ga. 1991) (class not unmanageable where plaintiffs come forward with sufficient evidence of formulaic approaches to measure of damages). Where there is no suitable formula for computing damages courts have concluded that a class could not be certified. *Wilcox Development Co.*, 97 F.R.D. at 447.

Similarly, in this case, the calculations that will have to be made will necessarily be individualized, not "virtually a mechanical task." *Id.*

Furthermore, the court is not convinced that, even under the Plaintiff's theory, relying on a special master to allocate funds would alleviate the manageability problems relevant to the damages determination in this case. Appointment of special masters is the exception and not the rule. Fed.R.Civ.Pro. 53(b). "A special master may be asked to make findings of fact, but due process requires that these be based upon evidence presented at an adversarial hearing." Manual for Complex Litigation, Third § 21.52 (1995). The Plaintiffs cite this court to a treatise in which the use of special masters is described as being that when liability has been determined in favor of the class and a formula for individual proof of damages has been established that is capable of being uniformly applied, courts refer the determination of damages to a special master. Plaintiff's Submission in Favor of Class Certification, page 50. The Plaintiffs have not, however, contended that there is, nor does it appear that there could be, a formula which could be uniformly applied to determine how the damages in this case could be allocated.

In *Buford v. H & R Block, Inc.*, 168 F.R.D. 340 (S.D.Ga.1996), the court considered the question of whether it could make an otherwise unmanageable class action manageable through creative means such as separate hearings and use of special masters. The court stated that effective alternative management is possible in cases where the class numbers in the hundreds or thousands, but that a class of millions of individuals where there are individual questions for each class member is not made manageable through the use of alternatives such as a special master. *Id.* at 364.

This court finds that the same reasoning applies in this case. The sheer complexity of the questions involved in making the damages determination means that individual class members, in a class which may exceed a million persons, will have to prove the amount of damages to which they are entitled. It does not appear that there is any

formula for calculating damages, nor is this a case where a particular amount, for instance a percent overcharge, can simply be multiplied by the number of products purchased. *See Davis v. Southern Bell Telephone & Telegraph Co.,* 1993 WL 593999, 1993 U.S. Dist. LEXIS 20033, at *22 (S.D.Fla.1993). Instead, the proposed class members sold cattle at various stages to other proposed class members and some of those proposed class members eventually sold finished cattle to IBP. At each stage, therefore, the price of the cattle was arguably affected by IBP's prices for finished cattle, but was also affected by other factors such as the characteristics of the cows or the sellers. One example of the kind of complexity posed by the Plaintiffs is the Plaintiffs' argument that class members who were afforded preferential treatment and believe that they have not been damaged by IBP's conduct can simply refuse to file a claim in Stage II. If these putative class members did not voluntarily refuse to file a claim, however, then evidence would have to be presented and a determination would have to be made as to whether these class members had suffered any injury. In other words, the court cannot rely on class members to make the decision of whether to make claims, and so will have to engage in a two-part inquiry of injury and the amount of damages for putative class members.

Although the Plaintiffs have urged this court to implement a strategy, whatever it might be, for handling this case, "litigating the plaintiffs' claims as class actions no matter what the cost in terms of judicial economy, efficiency, and fairness runs counter to the policies underlying Rule 23(b)(3)." *Andrews v. American Telephone & Telegraph Company,* 95 F.3d 1014 (11th Cir.1996); *see also Murry v. Griffin Wheel Company,* 172 F.R.D. 459 (N.D.Ala.1997) (even where court might "get by with certifying the class here requested" the court will not "ride herd on this particular 'would-be' class" where the problems to be addressed would be "virtually insurmountable"). Furthermore, "in light of the management problems noted above, plaintiffs have also failed to prove that a class action is the superior method of litigating these claims." *Wilcox Development Compa-*

*ny v. First Interstate Bank of Oregon,* 97 F.R.D. 440 (D.Or.1983).

Having satisfied neither one of the subsections under Rule 23(b), the court concludes that even had the commonality and typicality requirements been satisfied in this case, the Plaintiffs have failed to establish that this case may properly be certified as a class action under Rule 23. In so determining, this court has not, of course, made any inquiry into the ability of the Plaintiffs to prove the merits of their claims. The case will proceed on behalf of the named Plaintiffs on the claims they have asserted against IBP.

## IV. *CONCLUSION*

This court has conducted the rigorous analysis required by Rule 23 and has found that the Plaintiffs have failed to meet their burden of showing that the prerequisites of Rule 23 are satisfied by the proposed class action. The Plaintiffs' Motion for Class Certification is ORDERED DENIED.