### In re CONSOLIDATED "NON–FILING INSURANCE" FEE LITIGATION.

**Kenneth R. Christ, Jr., on behalf of himself and others similarly situated, Plaintiffs,**

**v.**

**Beneficial Corporation, et al., Defendants.**

**No. MDL 1130.**

United States District Court, M.D. Alabama, Northern Division.

Aug. 24, 2000.

---

## MEMORANDUM OPINION ON
## CLASS CERTIFICATION

CLEMON, Chief Judge.

### INTRODUCTION

Before the Court is Plaintiff Kenneth R. Christ's motion for certification of a nationwide class, pursuant to *Fed.R.Civ.P.* ("Rule") 23(a) and (b)(2). At issue in this case is the legality *vel non* of "non-filing" fees or premiums charged by Defendant Beneficial Corporation ("Beneficial") by and through its wholly-owned subsidiaries (including, without limitation, Defendant Beneficial Florida, Inc. ("BFI")) to consumers. Christ claims, on behalf of the putative class, that the imposition and use of these fees by Defendants under the circumstances violate the Truth–in–Lending Act, 15 U.S.C. § 1601, *et seq.* ("TILA") and the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961, *et seq.* ("RICO").

Christ filed this case on May 19, 1998, in the Middle District of Florida against Beneficial, BFI, Beneficial Management Corporation of America ("BMCA"), Beneficial Insurance Group, Inc., ("BIGI"), BFC Insurance

Agency of Nevada ("BFCIA"), WESCO Insurance Company ("WESCO"), and American Centennial Insurance Company ("ACIC").[1] The case was subsequently transferred to this Court by the Judicial Panel on Multi–District Litigation ("MDL Panel"), pursuant to 28 U.S.C. § 1407, for coordinated or consolidated pretrial proceedings with other cases raising the same issues, the lead case being *Nobels v. AVCO Fin. Servs.*, CV–94–CL–699–N (M.D.Ala.1994).

Based on the considerations which follow, this Court finds and concludes that Christ has satisfied all of the requirements of Rule 23(a) and (b)(2).

## I. NON-FILING INSURANCE ("NFI")

■ NFI generally covers losses due exclusively to a secured creditor's failure to file a financing statement under the state version of the Uniform Commercial Code (sometimes called a "UCC–1"). NFI covers a very narrow risk: the risk of loss occasioned solely by the first secured creditor's loss of priority as a result of its failure to perfect or record its lien—i.e., to file a UCC–1 in the appropriate state court. If a second secured creditor files a UCC–1 in the absence of a filing by the first secured creditor, then the first secured creditor's interest in the property is generally subordinated to that of the second. Under this scenario, NFI would cover the loss arising from the first secured creditor's failure to file a UCC–1. *See Edwards v. Your Credit, Inc.*, 148 F.3d 427 (5th Cir.1998).

■ Generally, a purchase money security interest ("PMSI") is created when a seller takes or retains an interest in the collateral that it sells in order to secure all or part of the collateral's price. A PMSI may also be created when a creditor gives value to enable a debtor to acquire rights in, or the use of, collateral.[2] PMSIs generally do not require the filing of a financing statement: PMSIs in consumer goods are automatically perfected.

■ NFIs are authorized by both TILA and by the laws of most of the states. *See* 15 U.S.C. § 1605(d)(2); Regulation Z, 12 C.F.R. § 226.4(e)(2). Under TILA, a non-filing insurance fee may be charged by a creditor as an "amount financed"—in which case it would be excluded from the "finance charge"—if the creditor complies with the requirements of TILA, 15 U.S.C. § 1605(d)(2), by purchasing such non-filing insurance. Generally, the premium charged for NFI may not exceed the amount charged under state law for the filing and releasing of a UCC–1.

## II. THE PLAINTIFF

Plaintiff Kenneth R. Christ, Jr. lives in Cape Coral, Florida. A native of Ohio, he is a 1976 graduate of Woodward High School of Toledo, Ohio. He moved to Florida in 1982, and since 1992 he has been employed as the kitchen manager for Rib City Grills, which has eight locations in South Florida.

On September 21, 1994, Christ obtained a consumer loan of $1,954.55 from BFI. The loan was to be repaid in 36 monthly installments of $81.00. The "Itemization of Amount Financed" reflects a "Non–Filing Insurance Premium" of $14.00. A "Documentary Excise Fee" of $7.00 is shown, as well as a "Motor Vehicle Certificate of Title Fee" in the amount of $28.25. The Beneficial loan document further reflects that the loan was secured by "Certain Household Goods" and a "Motor Vehicle." Exhibit 1, Deposition of Kenneth R. Christ ("Christ Depo"). Christ obtained this loan to consolidate his debts and to pay for repairs to his car. Christ Depo, at 59.

Christ obtained a second loan from BFI in October, 1995. The second loan refinanced the first loan after he fell behind in his payments. Although the loan documents reflect that, like the first loan, the second loan was secured by a security interest in a motor

---

1. ACIC has been dismissed from the case on the parties' joint motion.

2. The Uniform Commercial Code, § 9.107, defines a PMSI as a security "[t]aken or retained by the seller of the collateral to secure all or part of

its price; or ... [t]aken by a person who by making advances or incurring an obligation gives value to enable the debtor to acquire rights in or the use of collateral if such value is in fact so used."

vehicle and "Certain Household Items," no NFI fee was charged.

At BFI's invitation, after he fell behind in payments on the second loan, Christ obtained a third loan from BFI on June 29, 1998. Like the first contract, the 1998 loan embodies a NFI fee of $14.00. When he signed the loan documents for the third loan—which refinanced the second loan—Christ assumed that again he would not be charged an NFI fee. The NFI fee is disclosed on a page separate from the two pages on which Christ's signature appears. He did not read the page containing the itemization of the NFI fee in the "Amount Financed."

When Christ obtained the third loan, he was aware of the perceived illegality of BFI's NFI fees.

Christ is current in his payments on his third and only outstanding BFI loan.

In Christ's view, the NFI utilized by the Defendants is not insurance. In his words, it "is a no-risk insurance. It is illegal. It is not being used for what it is supposed to be used for." Christ Deposition, at 71. Christ contends that the NFI premiums were not used to purchase valid NFI insurance, but default insurance instead. Christ maintains that Beneficial's NFI was merely a sham by which Beneficial increased its income and profits. Thus, his position is that the disclosure on the loan documents of the NFI premium as an "Amount Financed" violates TILA.

With regard to his RICO claims, relevant facts are that Christ received in the mail a coupon book from BMCA, and using those coupons, he made his monthly payments to BFI by mail. He has received in the mail other correspondence from Defendants concerning late payments on his loans. Christ contends that by utilizing NFI as a scheme and artifice to defraud its customers, Defendants, acting as an enterprise, engaged in a pattern of racketeering activity by separate acts of mail fraud and interstate transportation of fraudulently-obtained monies. He contends that the "fees" collected by the Beneficial consumer finance subsidiaries all returned to Beneficial or one of its other subsidiaries in one form or another (e.g.,

commissions, bogus claims). He alleges that he relied on the representation that the NFI fee charged to him would be used to purchase valid insurance.

Christ has made it clear that in this lawsuit, "what [he] is asking for is for this to stop being charged, and they [Defendants] should be held responsible for what they have done." Christ Depo, at 149. In addition to restitution, he seeks declaratory and injunctive relief.

Christ has been actively involved in this case. He attempted to intervene in the *Nobels* case and attended the 1998 class certification hearing in Montgomery, Alabama. Since his case was transferred to this Court, Christ traveled to Atlanta, Georgia, where he submitted to deposition. He testified at the Montgomery, Alabama class certification hearing in this case.

Christ is aware of his responsibilities as the representative of the putative class. He has read the voluminous complaint several times. He has read parts of the TILA statute itself. His understanding of the conspiracy is as good as that of some lawyers (excluding, of course, those in this case). Christ Depo, at 175–77. He is aware that if the class loses the case, he may be liable of hundreds of thousands of dollars in costs.

### III. The Defendants

Prior to June 30, 1998, when its stock was acquired by Household Finance, Inc. ("Household"), Beneficial was a publicly traded holding company, which wholly owned the stock of BMCA, BFI, and at least twenty-six other consumer finance subsidiaries throughout the United States—insurance subsidiaries such as Defendants WESCO, BIGI and BFCIA. There is no showing that Beneficial's operational system has changed since Household acquired its stock.

Beneficial distributes policies and procedures for the employees of all of its subsidiaries, which guides their day-to-day activities on the job.

Beneficial funds the operation of the consumer finance subsidiaries.

The subsidiaries do not file separate tax returns; instead, Beneficial files a consolidat-

ed tax return which includes the financial operations of its consumer finance subsidiaries.

BMCA provides centralized management services to Beneficial's consumer lending subsidiaries and directs their activities and operations. It prepares the forms and financing documents which are used by the subsidiaries, with the generic Beneficial logo on the face page of each such form. The Wilmington, Delaware, headquarters of BMCA is the repository of the corporate books and records of the consumer finance subsidiaries. The minutes of the board meetings of the consumer lending subsidiaries, such as BFI, are kept at BMCA.

The annual meetings of the Boards of Directors of the separately-incorporated subsidiaries in the various states are held in the Beneficial corporate headquarters in Wilmington, Delaware.

Several of the officers and members of the Board of Directors of BMCA hold similar positions with the consumer finance subsidiaries. Elizabeth Dawson, an officer of BMCA, was simultaneously the vice-president and treasurer of each of the consumer finance subsidiaries. David Farris, the chief operating officer of Beneficial, is president of BMCA. The following table reflects the number of Beneficial officers who serve as higher officers (i.e., assistant secretary or above) in several of the consumer finance subsidiaries:

| State Subsidiary | Beneficial Officers |
| --- | --- |
| Arizona | 7 |
| California | 10 |
| Colorado | 4 |
| Delaware | 4 |
| Florida | 7 |
| Georgia | 6 |
| Hawaii | 6 |
| Indiana | 5 |
| Illinois | 4 |
| Indiana | 7 |

From time to time, monies in the separate accounts of the consumer finance companies such as BFI are "swept and moved upstream" to BMCA.

The salaries of the officers and board members of the consumer finance subsidiaries are paid by BMCA.

BMCA provides legal representation for the consumer finance companies.

BMCA negotiates the terms of NFI between the wholly-owned insurance subsidiaries and the wholly-owned consumer finance subsidiaries which use NFI. It decides whether a consumer finance subsidiary will utilize NFI.

Between October 1, 1990, and March 31, 1997, WESCO, a Beneficial insurance subsidiary, collected $20,380,766 in NFI premiums from its consumer finance subsidiaries, including BFI. Of that amount, $18,174,560.97 was paid back to the consumer finance companies, with WESCO retaining the remaining 10.82%. Thus, Beneficial's wholly-owned subsidiaries retained 100% of all the NFI premiums paid by borrowers during that period.

As of January 1999, WESCO ceased selling or otherwise providing NFI. At the same time, BFI ceased purchasing NFI and charging the premium to its borrowers. Since the evidence does not indicate otherwise, the Court assumes that another Beneficial insurance subsidiary now provides NFI for Beneficial's other consumer finance subsidiaries.

The Court finds and determines that BMCA, the consumer finance subsidiaries, and the insurance subsidiaries of Beneficial, are sufficiently interrelated to justify piercing their corporate veils. It deems Beneficial's consumer finance and insurance subsidiaries as its *alter ego. See Clausen et al. v. Beneficial Finance Co. of Berkeley, Inc. and Beneficial Corp.*, 423 F.Supp. 985, 986 n. 2 (N.D.Cal.1976).

IV. APPLICABLE LEGAL STANDARDS

Certification of a 23(b)(2) class action is appropriate where the requirements of *Fed. R.Civ.P.* 23(a) are met and the requirements of *Fed.R.Civ.P.* 23(b)(2) are met. Rule 23(a) contains four requirements:

(1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interest of the class.

Rule 23(a)(1)'s requirement of *numerosity* is satisfied where joinder of all class members is impracticable. A court is not required to find that joinder is impossible in order to find numerosity; it need only find that the difficulty or inconvenience of joining all class members makes class litigation desirable. *See In re Polypropylene Carpet Antitrust Litig.*, 178 F.R.D. 603, 612 (N.D.Ga. 1997); *In re Alexander Grant & Co. Litig.*, 110 F.R.D. 528, 532–34 (S.D.Fla.1986).

Rule 23(a)(2)'s requirement of *commonality* is satisfied where there are common questions of law or fact in a case, and where these common questions are substantially related to resolution of the litigation. *See DeBoer v. Mellon Mortgage Co.*, 64 F.3d 1171, 1174 (8th Cir.1995); *Perry v. Household Retail Servs., Inc.*, 180 F.R.D. 423, 430 (M.D.Ala.1998); *Coleman v. Cannon Oil Co.*, 141 F.R.D. 516, 521 (M.D.Ala.1992). The Rule does not require identical questions of law or fact common to the putative class. *See Perry*, 180 F.R.D. at 430. Further, commonality is not required on every question raised in a putative class action. *See De-Boer*, 64 F.3d at 1174.

Rule 23(a)(3)'s requirement of *typicality* is satisfied where the claims of the named plaintiff "arise from the same event or pattern or practice and are based on the same legal theory" as the claims of the putative class. *Kornberg v. Carnival Cruise Lines, Inc.*, 741 F.2d 1332, 1337 (11th Cir. 1984); *In re American Medical Sys., Inc.*, 75 F.3d 1069, 1082 (6th Cir.1996) (holding that typicality exists when "a plaintiff's injury arises from or is directly related to a wrong to a class, and that wrong includes the wrong to the plaintiff."); *Andrews v. AT & T*, 95 F.3d 1014, 1022–23 (11th Cir.1996). Put another way, there must be a nexus between the claims of the named plaintiff and the common questions of fact or law which unite the class. *Pickett v. IBP, Inc.*, 182 F.R.D. 647, 651 (M.D.Ala.1998).

To prove typicality, the named plaintiff is not required to establish that his circumstances and those of the putative class are identical. *See In re NASDAQ Market-Makers Antitrust Litig.*, 169 F.R.D. at 511–12. For injunctive relief, typicality is met where the named plaintiff and the putative class seek the same kind of injunctive relief, even though the specific amounts of money at issue for individual plaintiffs may vary. *See DeBoer*, 64 F.3d at 1175.

Finally, Rule 23(b)(4)'s requirement of *adequacy of representation* has two prongs: 1) adequacy of the named plaintiff, and 2) adequacy of counsel for the putative class.

The named plaintiff's adequacy to represent the putative class is established where the said plaintiff 1) has common interests with the unnamed class members, 2) will vigorously prosecute the interests of the class through qualified counsel, and 3) has no antagonistic interests with the interests of the class. *See In re American Medical Sys., Inc.*, 75 F.3d at 1083; *Andrews*, 95 F.3d at 1023; *General Tel. Co. of Southwest v. Falcon*, 457 U.S. 147, 157 n. 13, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982); *In re NASDAQ Market–Makers Antitrust Litig.*, 169 F.R.D. at 512–13; *Ross v. A.H. Robins Co.*, 100 F.R.D. 5, 7 (S.D.N.Y.1982). The requirements of commonality and typicality tend to merge into the adequacy-of-representation requirement. *See General Tel. Co. of Southwest*, 457 U.S. at 157 n. 13, 102 S.Ct. 2364.

To certify a 23(b)(2) class, the named plaintiff not only must satisfy all of the above requirements under 23(a), but he must also satisfy the specific requirements of 23(b)(2): "[T]he party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole."

An action is proper for certification under 23(b)(2) if the defendants' policies and conduct affect the entire class. *See County of Suffolk v. Long Island Lighting Co.*, 907 F.2d 1295 (2d Cir.1990); *In re NASDAQ Market–Makers Antitrust Litig.*, 169 F.R.D. at 515–16. Further, 23(b)(2) class certification is appropriate where declaratory or injunctive relief is an important aspect of the overall relief sought. *See id.* at 516.

■ Where plaintiffs seek 23(b)(2) certification as well as monetary relief, class certification under 23(b)(2) is nonetheless appropriate where the injunctive or declaratory relief sought *predominates* over the monetary relief also sought. *See Allison v. Citgo Petroleum Corp.,* 151 F.3d 402, 411–13 (5th Cir. 1998). Monetary relief predominates when its presence in the litigation suggests that the procedural safeguards of notice and opt-out, as required by 23(b)(3), are necessary—that is, where the monetary relief sought is less of a group remedy and, instead, depends more on varying circumstances and merits of each potential class member's case. *See Allison,* 151 F.3d at 413–14. Claims for monetary relief do not predominate where such monetary relief is *incidental* to the requested injunctive or declaratory relief. *See id.* at 415. Incidental damages are only those damages to which class members would be automatically entitled once classwide liability is established. *See id.; Swanson v. Mid Am, Inc.,* 186 F.R.D. 665, 669 (M.D.Fla.1999)

■ A defendant's voluntary cessation of conduct challenged in litigation does not moot the issue of declaratory or injunctive relief. As the Supreme Court noted nearly a half-century ago, "voluntary cessation of the allegedly illegal conduct does not deprive the tribunal of power to hear and determine the controversy, [for otherwise] the defendant is free to return to his old ways. [footnote omitted.] This, together with a public interest in having the legality of the practices settled, mitigates against a mootness conclusion." *United States v. W.T. Grant Co.,* 345 U.S. 629, 632, 73 S.Ct. 894, 97 L.Ed. 1303 (1953). In *W.T. Grant Co.,* the Court pointed out that a case may indeed be mooted if the defendant can carry the "heavy burden" of demonstrating that "there is no reasonable expectation that the wrong will be repeated," but the mere cessation of the challenged conduct coupled with a disclaimer of an intention to revive it is insufficient. 345 U.S. at 633, 73 S.Ct. 894. The cessation and disclaimer are to be included among other "factors to be considered in determining the appropriateness of granting an injunction against the now-discontinued acts." *Id.* In any event, "the court's power to grant injunctive relief survives discontinuance of the illegal conduct." *Id.*

■ Injunctive and declaratory relief are available under TILA. *See Tower v. Moss,* 625 F.2d 1161 (5th Cir.1980) (class certified under TILA with option to rescind offered after settlement of common claim); *Blair v. Nat'l Const. Co. of the South,* 611 F.2d 80, 81 n. 5 (5th Cir.1980); *Williams v. Empire Funding Corp.,* 183 F.R.D. 428, 435–36 (E.D.Pa.1998) (finding that "there is nothing in the language of TILA which precludes the use of the class action mechanism provided by Rule 23 to obtain a judicial declaration whether an infirmity in the documents, common to all members of the class, entitles each member of the class individually to seek recision."); *see Jones v. Bill Heard Chevrolet, Inc.,* 212 F.3d 1356, 1364 (11th Cir.2000).

■ Generally, although individual reliance is one of the elements of a RICO claim, the reliance requirement is not an insurmountable hurdle to class certification in a RICO case, particularly where a common course of fraudulent or deceptive conduct is alleged. *See Andrews,* 95 F.3d at 1026 (J. Barkett, dissenting opinion) (citing *Kirkpatrick v. J.C. Bradford & Co.,* 827 F.2d 718 (11th Cir.1987));[3] *System Management, Inc. v. Loiselle,* 91 F.Supp.2d 401 (D.C.Mass. 2000).

Although the Eleventh Circuit has not addressed the issue, it has been held that injunctive relief is not available under RICO.[4]

---

**3.** On remand, the district judge in *Andrews* noted:

> I previously concluded that the individual issues of reliance injury, and damages do not preclude class certification in this case, and the panel's majority opinion in Andrews does not alter that conclusion. . . . I concluded that reliance could be presumed under the facts of this case.

*Sikes v. AT & T,* 179 F.R.D. 342, 347 (S.D.Ga. 1998).

**4.** See *Religious Tech. Center v. Wollersheim,* 796 F.2d 1076 (9th Cir.1987) (holding that injunctive relief is not available to a private party under the statute); G. Robert Blakey, *The Availability of Equitable Relief in Civil Causes of Action in RICO,* 59 NOTRE DAME L. REV. 945 (1984); and *U.S. v. Cappetto,* 502 F.2d 1351 (7th Cir.

## V. ANALYSIS

 This case is not mooted by the fact that BFI and WESCO have removed themselves from the NFI business—for reasons known only to themselves and Beneficial. Beneficial may decide, immediately after the termination of this litigation, that another of its *alter egos* should resume the NFI business in Florida. The cessation of the NFI aspect of BFI's business, and WESCO's decision to discontinue writing NFI, were not accompanied by disclaimers of respective intentions not to revive the NFI business. The affidavits attesting to the cessation are thunderously silent on this issue. In any event, this case and the class certification issue are not moot.

The Court now turns to consideration of whether the named Plaintiff satisfies the five requirements of Rule 23.

### Rule 23(a)(1)

 The Court independently determines, based on the evidence presented, that the numerosity requirement is satisfied.[5] Indeed, Plaintiffs reside in all of the 50 states; the proposed class consists of thousands or tens of thousands of Plaintiffs; and joinder of such a large number of claims is clearly impracticable.

### Rule 23(a)(2)

 The *commonality* requirement is met because common questions of law and fact abound in this case, and the Defendants have not been heard to argue otherwise. Is NFI, as utilized by the Defendants, really NFI? Is the Defendant's NFI really default insurance? Was the purpose of the Defendants' use of NFI to increase their income and profits? Was the Defendants' use of NFI a scheme and artifice to defraud? Did the "stop loss" provisions of the Defendants' policies remove the risk to the insurer and thereby negate the existence of true insurance? *See DeBoer*, 64 F.3d at 1174. These examples are merely illustrative of the myriad common questions presented in this litigation.

The basic claim of the named Plaintiff and the putative class is virtually identical: Did the Defendants uniformly charge them for what was represented to be NFI when, in fact, it was not?[6]

There is no merit to Defendants' argument that Plaintiffs' claims are based on Florida law, and resolution of this case turns on the insurance laws of the fifty states. In point of fact, Plaintiff's claims and those of the putative class turn on federal laws: TILA and RICO. These federal statutes are the legal bases of this litigation. Further, it is TILA, not state law, that determines what may be charged and disclosed as an "amount financed," as opposed to a "finance charge." *See Johnson v. Fleet Fin., Inc.*, 4 F.3d 946 (11th Cir.1993); *Friend v. Termplan, Inc.*, 651 F.2d 1012 (5th Cir. Unit B 1981); *see also* 15 U.S.C. § 1610(a)(1) (providing that TILA's disclosure requirements supersede inconsistent state laws). Therefore, regardless of whether insurance laws among the 50 states are inconsistent, federal law controls the claims alleged by the putative class, and it supersedes the laws of the individual states.

 The Christ's TILA claims predicated on his 1994 loan documents are subject to the doctrine of equitable tolling.[7] Equitable toll-

---

1974) (finding that RICO's remedial provision provides for broad equitable relief).

5. The Beneficial Defendants have conceded that for purposes of a Florida statewide class, the numerosity requirement is met. And if the requirement is met by the BFI customers alone, then surely it is met when the other twenty-eight states are added to the mix.

6. Regardless of whether the non-filing insurance fee imposed by Defendants was proper under TILA, its presence in each of the loan and disclosure forms received by Plaintiffs is what is signif-

icant in finding that a class should be certified pursuant to 23(b)(2).

7. The Eleventh Circuit Court of Appeals, and every other federal court of appeals, has recognized that TILA's statute of limitations is subject to equitable tolling when the violation of TILA is either self-concealing or is fraudulently concealed by the defendant. *See Ellis v. General Motors Acceptance Corp.*, 160 F.3d 703 (11th Cir.1998).

Insofar as the TILA claim is based on the 1998 loan documents, it is timely asserted by the Plaintiff on behalf of the putative class.

ing is justified where, as here, Plaintiff has established that Defendants concealed from him the alleged fact that the NSI fee was not being used for the purpose indicated in the loan documents, and the Plaintiff had no reasonable basis for knowing that in fact the NFI fee was not being used for that purpose.[8]

### Rule 23(a)(3)

■■■ The claims of the absent class members, like those of Christ, arise from identical form documents prepared by Defendants and from uniform NFI fees exacted by them. Christ's incentive and motivation to litigate the absent class members' claims is co-extensive with his own. He has indubitably manifested his personal commitment to the representation of the absent class members. *See Andrews*, 95 F.3d at 1022–23. The alleged wrong to which Christ was subjected is identical to that of the putative class.

Defendants contend that a large number of the class members are in default on their loans or credit transactions and are therefore subject to mandatory counterclaims, thereby making Christ, as a class representative, atypical of the defaulting class members. This contention is belied, however, by the definition of the class, which specifically *excludes* transactions which are in substantial default.

### Rule 23(a)(4)

■■■ Finally, Christ meets the fourth requirement under 23(a): *adequacy of representation.* He has no interests which conflict with or are antagonistic to the interests of the absent class members. *See General Tel. Co. of Southwest*, 457 U.S. at 157 n. 13, 102 S.Ct. 2364.

It is a straw man argument that antagonism exists between Christ and the putative class members because some of the members would prefer paying a NFI fee rather than a UCC–1 filing fee. TILA and the laws of most states, including Florida, simply require that the NFI fee *not exceed* the UCC–1

charges. It may well be, in a given state, that the UCC–1 filing fee and the NFI fee are identical. Whether the NFIs charged by the consumer finance subsidiaries are in fact lower than the UCC–1 filing fees is less than certain.[9]

More importantly, no evidence in the record shows that if Beneficial did not impose fees for NFI, it would invariably file UCC–1 statements. Indeed, the evidence shows precisely the opposite: When BSI did not impose the NFI fee on Christ's second loan, it did not file a UCC–1 and impose its attendant costs on Christ. There is simply nothing in the evidence establishing that either before the advent of BFI's NFI program, or after its abrupt cessation in the face of this litigation, BFI routinely filed UCC–1 when it financed the purchase of consumer goods or debt consolidation secured by household goods.

If this Court were to enjoin Defendants and/or declare their practices unlawful under TILA and/or RICO, both Christ and the absent members would benefit in precisely the same way. There is certainly no showing of collusion between Christ and Defendants.

Christ's counsel have handily met the second prong of the *General Tel. Co. of Southwest* test: Their track record in vigorously and capably prosecuting this action is second to none. Simply put, counsel for the putative class are eminently qualified, thoroughly experienced, and uniquely capable of representing their clients in this action. *See General Tel. Co. of Southwest*, 457 U.S. at 157 n. 13, 102 S.Ct. 2364.

### Rule 23(b)(2)

■■■ Rule 23(b)(2)'s requirements are easily met in this case. Without doubt, the Beneficial Defendants have acted on grounds generally applicable to the class. The legality *vel non* of those grounds is what this lawsuit will ultimately determine, but when these Defendants imposed a uniform NFI fee on all members of the putative class, they

---

8. The commonality analysis *vis-a-vis* equitable tolling similarly applies to the typicality requirement.

9. For example, Plaintiff's Exhibit 96 reflects that the UCC–1 recording and releasing fees in Florida total $14.00. That amount is identical to the NFI premium charged by BFI.

acted on grounds generally applicable to that class.

Christ seeks to bring an everlasting death to what he perceives to be a very pernicious practice of these Defendants—defrauding consumers by illegally using NFI as a mask to collect revenues to which the Defendants are not entitled. The objective of Christ as Plaintiff is to declare that Defendants have illegally abused NFI in the past and to enjoin Defendants from resuming the illegal use of NFI in the future.

Thus, the relief that Christ seeks is quintessentially declaratory and injunctive, rather than damage-oriented. Individual damages for the TILA and RICO violations pale into insignificance when compared with the declaratory and injunctive relief to which the class would be entitled, should it prevail. And while the plaintiff class may not be entitled to injunctive relief under RICO, if it prevails on the merits, it would at a minimum be entitled to a declaration that the Defendants' conduct violates that statute.

The damages sought by the Plaintiff on behalf of the class are merely incidental to the declaratory and injunctive relief. *See Allison,* 151 F.3d at 415–16.

The monetary damages which the plaintiff class seeks are not the garden-variety Rule 23(b)(3) damages. Damages for mental anguish and punitive damages are not sought. The plaintiff class seeks to be placed in the position it would have occupied *but for* what it perceives to be illegal NFI fees, plus the limited statutory damages to which RICO and TILA would entitle each class member, should the class prevail. In this respect, the damages that the class seeks are restitutionary—fully consistent with the equitable orientation of Rule 23(b)(2).

Moreover, the damages sought are not based on the varying circumstances and disparate merits of individual claims. Rather, these damages are uniform to all class members—restitution of a standard NFI premium (sometimes as low as $4.00) imposed by a Beneficial consumer finance subsidiary. The homogenous and cohesive nature of the class thus remains intact at the damages stage of the litigation. *See Allison,* 151 F.3d at 411–13.

The Court judicially notes the settlements with other defendants in the companion MDL cases. Almost without exception, each of these settlements removes the settling defendants, some immediately and others later, from the business of handling NFI altogether.

Clearly, then, the declaratory and injunctive relief which the class plaintiffs seek predominates over the monetary relief sought. *Id.*

## VI. CONCLUSION

Based on the foregoing, this Court finds that this action should be certified conditionally as a 23(b)(2) class action.

By separate order, the Court will certify Plaintiff Kenneth R. Christ, Jr. as the representative of a class consisting of all persons in the United States who were charged a fee for non-filing insurance by one of the consumer finance subsidiaries [10] of the Beneficial Corporation at anytime from May 19, 1994, to the present, and who are not otherwise excluded from the defined class.

Persons and transactions otherwise excluded from the defined class are:

(A) Persons who are deceased on the date that the final judgment is entered in this action;

(B) Persons who are members of a previously certified class against any named Defendant in this action for the TILA and RICO claims asserted herein;

---

**10.** Beneficial Arizona, Inc., Beneficial California, Inc., Beneficial Colorado, Inc., Beneficial Delaware, Inc., Beneficial Florida, Inc., Beneficial Georgia, Inc., Beneficial Hawaii, Inc., Beneficial Idaho, Inc., Beneficial Illinois, Inc., Beneficial Indiana, Inc., Beneficial Kansas, Inc., Beneficial Maryland, Inc., Beneficial Loan & Thrift Co., Beneficial Minnesota, Inc., Beneficial Mississippi, Inc., Beneficial Missouri, Inc., Beneficial Nebraska, Inc., Beneficial New Mexico, Inc., Beneficial New York, Inc., Beneficial Ohio, Inc., Beneficial Oklahoma, Inc., Beneficial Oregon, Inc., Beneficial Consumer Discount Company, Beneficial South Carolina, inc., Beneficial Tennessee, Inc., Beneficial Texas, Inc., Beneficial Utah, Inc., Beneficial Virginia, Inc., and Beneficial West Virginia, Inc.

(C) Written loan or credit purchase agreements or billing documents which do not contain a fee or charge for non-filing insurance disclosed or treated as part of the "amount financed";

(D) Those transactions (i.e., written loan or credit purchase agreements or billing documents containing a fee or charge for non-filing insurance disclosed or treated as part of "amount financed") which are in "true default." A transaction is in "true default" if:

(1) The borrower has made no payment on his or her account during the six (6) month period immediately preceding the date of the final judgment to be entered in this action; or

(2) The debt has been "charged-off" by Defendants in accordance with Defendants' usual and customary practices and procedures, and Defendants have not and will not make any effort to collect the charged-off debt; or

(3) A Beneficial Defendant has obtained a judgment for the debt.

(E) Persons who, as of the date of this class certification, have pending in any court an individual action against any Defendant named in this action, or who have obtained a judgment against any Defendant named in this action, or who have executed a release in favor of any Defendant named in this action which encompasses, adjudicates or releases all of the certified claims in this action;

(F) Those transactions which have been included in a liquidation proceeding (Chapter 7) under the United States Bankruptcy Code prior to the date that the final judgment is entered in this action;

(G) Those transactions which are subject to a valid arbitration agreement.